# Exhibit 1

## to

# Defendant Ascension Health's Motion to Dismiss

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. STEPHEN MCMULLEN, | ) ) | No. 3:12-CV-00501 |
| Relator, | ) ) | |
| v. | ) ) | Judge Campbell |
| ASCENSION HEALTH, | ) ) | |
| | ) | Magistrate Judge Griffin |
| Defendant. | ) | |

## DECLARATION OF JAMES C. BUCK IN SUPPORT OF DEFENDANT ASCENSION HEALTH'S MOTION TO DISMISS RELATOR'S COMPLAINT FOR DAMAGES

I, James C. Buck, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am associated with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, in Washington, D.C.   I am duly licensed to practice before the courts of the State of Maryland and the District of Columbia and have been admitted to appear *pro hac vice* in the captioned matter.  I am counsel to Ascension Health in the captioned matter and make this Declaration in support of Defendant Ascension Health's Motion to Dismiss Relator's Complaint For Damages. I make this Declaration based on my personal knowledge, and if called upon to do so, I could and would testify competently thereto.

2.      Attached hereto as Exhibit A is a copy of the complaint filed on September 10, 2008, in the case captioned *United States ex rel. McMullen v. Cigna Gov't Servs.*, LLC, No. 2:08-cv-02586-SHM-tmp (W.D. Tenn.), that was obtained on June 17, 2013 from United States District Court for the Western District of Tennessee's CM/ECF system.  This document is available with a PACER subscription at  https://ecf.tnwd.uscourts.gov/doc1/ 17111205666.

3.      Attached hereto as Exhibit B is a copy of the complaint filed on September 10, 2008, in the case captioned *United States ex rel. McMullen v. The West Clinic, P.C.*, No. 2:08-

cv-02587-BBD-cgc (W.D. Tenn.), that was obtained on June 17, 2013 from United States District Court for the Western District of Tennessee's CM/ECF system. This document is available with a PACER subscription at https://ecf.tnwd.uscourts.gov/doc1/17111205716.

4.      Attached hereto as Exhibit C is a true and correct copy of Ascension Health's Articles of Amendment for a Nonprofit Corporation, dated December 7, 2011, that was obtained from and certified by the Secretary of the State of Missouri on June 13, 2013. This document is publicly available from the Secretary of State for the State of Missouri.

5.      Attached hereto as Exhibit D are true and correct copies of pages 1 and 8 of Ascension Health Alliance's Consolidated Interim Financial Statements and Supplementary Information for the years ended June 30, 2012 and 2011 with Reports of Independent Auditors, that was obtained on June 17, 2013. This document is available in its entirety at http://www.ascensionhealth.org/assets/Audited_ Financial_Statements_for_the_Year_Ended_ June_30_2012.pdf.

6.      Attached hereto as Exhibit E is a copy of an Accreditation Quality Report for Baptist Hospital from the Joint Commission, formerly known as the Joint Commission on Accreditation of Healthcare Organizations, that was obtained on June 17, 2013 from the Joint Commission's website (www.jointcommission.org). This document is available at http://www.qualitycheck.org/qualityreport.aspx?hcoid=7884.

7.      Attached hereto as Exhibit F is a copy of the Centers for Medicare and Medicaid Services Medicare Administrative Contractor Award background sheet for Jurisdiction 10 that was obtained on June 17, 2013 from the Centers for Medicare and Medicaid Services website (www.cms.gov). This document is available at http://www.cms.gov/Medicare /Medicare-

Contracting/MedicareContractingReform/Downloads/AB_MAC_Jurisdictions/
Jurisdiction_10/J10AwardBackgroundSheet.pdf?DLPage=1&DLSort=0&DLSortDir=ascending.

8.    Attached hereto as Exhibit G is a true and correct copy of BlueCross BlueShield of Tennessee (Riverbend Government Benefits Administrator) local coverage determination L1352, that was obtained on June 17, 2013 from the Centers for Medicare and Medicaid Services Medicare Coverage Database Archive (http://coverage.cms.fu.com/mcd_archive/ overview.asp). This document is available at http://coverage.cms.fu.com/mcd_archive/viewlcd_ pdf.asp?lcd_id =1352&lcd_version=42&contractor_id=59.

9.    Attached hereto as Exhibit H is a copy of a license verification for Baptist Hospital that was obtained on June 17, 2013 from the website of the State of Tennessee Department of Health (http://health.state.tn.us/HCF/Facilities_Listings/facilities.htm).

10.    Attached hereto as Exhibit I are true and correct copies of the Certificate of St. Thomas Baptist Health Corporation (F/K/A Middle Tennessee Health Corporation) Concerning its Amended and Restated Charter and the Amended and Restated Charter of St. Thomas Baptist Heath Corporation, dated December 31, 2001. These documents were obtained from the Secretary of State for the State of Tennessee on June 14, 2013, and are publicly available from the Secretary of State for the State of Tennessee.

11.    Attached hereto as Exhibit J are true and correct copies of the Certificate of Seton Corporation Concerning its Amended and Restated Charter and the Amended and Restated Charter of Seton Corporation dated December 31, 2001. These documents were obtained from the Secretary of State for the State of Tennessee on June 18, 2013, and are publicly available from the Secretary of State for the State of Tennessee.

12.     Attached hereto as Exhibit K is a true and correct copy of the Application for Assumed Corporate Name by Seton Corporation to transact business as Baptist Hospital, dated December 31, 2001, that was obtained from Secretary of State for the State of Tennessee on June 18, 2013. This document is publicly available from the Secretary of State for the State of Tennessee.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 18, 2013, at Washington, District of Columbia.

James C. Buck

**Exhibit A**

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA *EX REL.*          )
STEPHEN MCMULLEN,                           )
                                            )
      Relator,                              )
                                            )
vs.                                         )          Case No._____
                                            )
CIGNA GOVERNMENT SERVICES, LLC.,            )     **TO BE FILED IN CAMERA AND**
                                            )     **UNDER SEAL**
      Defendant.                            )
                                            )     Pursuant to 31 U.S.C. § 3730(b)(2)
                                            )
                                            )
                                            )
                                            )

## RELATOR'S COMPLAINT FOR DAMAGES
## UNDER THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ*.

    Relator, Stephen McMullen, for his cause of action states as follows against Defendant CIGNA Government Services, LLC.

### CAUSE OF ACTION

    1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false Medicare claims paid by Defendant for unreasonable or unnecessary medical services.  This is a cause of action brought by Relator pursuant to 31 U.S.C. § 3729 and the *qui tam* provisions of that statute found at 31 U.S.C. §§ 3730 and 3731.

    2.    31 U.S.C. § 3730(b)(2) provides that "[t]he complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.  The Government may elect to intervene and proceed with the action within 60

days after it receives both the complaint and the material evidence and information." Plaintiff is filing this matter under seal.

3.     A copy of the evidentiary disclosure required by the False Claims Act has already been served on the United States.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this matter because the claim for relief arises under 31 U.S.C. § 3729, *et seq*. Venue is proper in this district pursuant to 31 U.S.C. § 3732 because Defendants transact business in this judicial district.

## PARTIES

5.     At all times relevant hereto, Relator Stephen McMullen ("Relator") was a citizen and resident of the State of Tennessee and was employed by Memphis Heart Hospital in Memphis, Tennessee. Relator has witnessed the events as set forth herein. Relator is currently a resident of the State of Washington.

6.     Defendant CIGNA Government Services, LLC ("CIGNA") is a foreign company that maintains its principal place of business at 1 Liberty Place, 1650 Market St., Philadelphia, PA 19192-1550. CIGNA is a wholly owned subsidiary of CIGNA Corporation – one of the nation's premiere health insurance companies. Since 1966, CIGNA has administered the federal Medicare program. Today, CIGNA provides a variety of services for Medicare providers, suppliers, and beneficiaries in 18 states and the U.S. Virgin Islands. As a Part B contracted carrier for the Centers for Medicare & Medicaid Services (CMS), CIGNA processes and pays Medicare claims according to the federal laws and CMS rules and regulations. CIGNA provides Medicare claims processing and support services for Medicare Part B in Tennessee, North Carolina and Idaho.

2

## BACKGROUND FACTS

7.     Pursuant to Title XVIII of the Social Security Act, §1833(e) states, "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."

8.     The primary authority for all Medicare coverage provisions and subsequent policies is the Social Security Act.  Contractors, such as CIGNA, use Medicare policies in the form of regulations, National Coverage Determinations ("NCDs"), coverage provisions in interpretative manuals, and Local Coverage Determinations ("LCDs"), to apply the provisions of the Social Security Act.

9.     The NCDs are developed by CMS to describe the circumstances for Medicare coverage nationwide for a specific medical service procedure or device.  NCDs outline the conditions for which services consider to be covered (or not covered) under §1862(a)(1) of the Social Security Act or other applicable provisions of the Social Security Act.  NCDs are issued as a program instruction.  Once published in a CMS program instruction, an NCD is binding on all Medicare carriers.

10.     When a new NCD is published, the contractor shall notify the provider community as soon as possible of the change and corresponding effective date.  This is a Provider Communications (PCOM) activity.  Within thirty (30) calendar days after an NCD is issued by CMS, contractors shall either publish the NCD on the contractor website or link to the

3

NCD from the contractor website.  Medicare Program Integrity Manual, Ch. 13.1.1 – National Coverage Determinations.

11.    The contractor *shall* apply NCDs when reviewing claims for services addressed by NCDs.  When making individual claims determinations, contractors have no authority to deviate from NCDs if absolute words such as "never" or "only if" are used in the policy. Medicare Program Integrity Manual, Ch. 13.1.1 – National Coverage Determinations.

12.    Section 522 of the Benefits Improvement and Protection Act created the term "Local Coverage Determination" (LCD).  An LCD is a decision by a Medicare administrative contractor or carrier whether to cover a particular service in accordance with §1862(a)(1)(A) of the Social Security Act.  The difference between a Local Medical Review Policy (LMRP) and LCDs is that LCDs consist of only "reasonable and necessary" information, while LMRPs may also contain benefit category and statutory exclusion provisions.  Beginning in 2003, contractors began issuing LCDs insead of LMRPs and were instructed to convert all existing LMRPs into LCDs.  Medicare Program Integrity Manual, Ch. 13.1.3.

13.    The LCDs specify under what clinical circumstances a service is considered to be reasonable and necessary and are administrative and educational tools to assist providers in submitting correct claims for payment.  Contractors, such as CIGNA, publish LCDs to provide guidance to the public and medical community within their jurisdictions.  Contractors develop LCDs by considering medical literature, advice of local medical societies and medical consultants, public comments, and comments from the provider community.  The contractor is required to adopt LCDs that have been developed individually or collaboratively with other contractors.  The contractor shall ensure that all LCDs are consistent with all statutes, rulings,

4

regulations, and national coverage, payment, and coding policies. Medicare Program Integrity Manual, Ch. 13.1.3 – Local Coverage Determinations.

14.     Contractors shall ensure that the LCDs appearing on the contractor's LCD website and the LCDs appearing in the Medicare Coverage Database are identical. Medicare Program Integrity Manual, Ch. 13.4 – When to Develop New/Revised LCDs.

15.     Contractors shall ensure that LCDs are developed for services only within their jurisdiction. The LCD shall be clear, concise, properly formatted and not restricted to conflict with NCDs or coverage provisions in interpretative manuals. Medicare Program Integrity Manual, Ch. 13.5 – Content of an LCD.

16.     A service may be covered by a contractor if it is reasonable and necessary under 1862(a)(1)(A) of the Social Security Act. Only reasonable and necessary provisions are considered part of the LCD. In order to be covered under Medicare, a service must be *reasonable* and *necessary*. When appropriate, contractors shall describe the circumstances under which the proposed LCD for the service is considered *reasonable* and *necessary*. Medicare Program Integrity Manual, Ch. 13.5.1 – Reasonable and Necessary Provisions in LCDs.

17.     The Defendant, CIGNA, has issued LCDs regarding noninvasive vascular studies in Tennessee, Idaho and North Carolina. Attached as Exhibit A is the Article for Noninvasive Vascular Studies (A34531) which address the reasonable and necessary status of noninvasive vascular studies. See Exhibit A, attached.

18.     According to the Article for Noninvasive Vascular Studies, noninvasive vascular studies include the performance of the studies and patient care required to perform the studies, supervision of the studies and interpretation of the study results with copies for patient records of hardcopy output or imaging when provided. It is the responsibility of the provider to ensure the

medical necessity of procedures and to maintain a record for possible audit.  Noninvasive vascular studies are medically necessary only if the outcome will potentially impact the diagnosis or clinical course of the patient.

19.    The Article for Noninvasive Vascular Studies states as follows:

> The accuracy of noninvasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist and the physician performing the interpretation of the study. Consequently, technologist and physicians must be able to show documentation of training and experience as well as maintain these credentials at each office site.  All noninvasive vascular diagnostic studies must be: (1) *performed* by a qualified physician, (2) *performed* by or under the supervision of persons that have demonstrated minimum entry level competency as evidenced by being credentialed in vascular technology, or (3) performed in facilities with laboratories accredited in vascular technology.  Example of appropriate personal certification include the Registered Vascular Technologist (RVT) credential and the Registered Vascular Specialist (RVS) credential in vascular technology.  Appropriate laboratory accreditation includes the Intersocietal Commission for the Accreditation of Vascular Laboratories (ICAVL) and/or the American College of Radiology (ACR).  This accreditation will be required as of January 1, 2004.

> Title XVIII of the Social Security Act Section 1833(e). <u>This section prohibits Medicare payment for any claim which lacks the necessary information to process the claim.</u>

**<u>Facts Pertaining To Relator Stephen McMullen</u>**

20.    Relator, Stephen McMullen, is an original source who has direct and independent knowledge of the information on which the allegations in this Complaint are based and has voluntarily provided the information to the government before filing an action based on the information contained herein.

21.    Relator, Stephen McMullen, worked for the Memphis Heart Clinic in Memphis, Tennessee from approximately June 2008 through August 2008.  Relator is a Registered

Vascular Technologist (RVT) credentialed and accredited by the American Registry of Diagnostic Medical Sonographers.

22.     Relator states that while he was properly credentialed as a vascular technologist, many of the technologist at Memphis Heart Clinic performing noninvasive vascular studies were not credentialed as vascular technologist.   Additionally, Relator states that none of the noninvasive vascular studies performed during his employment at the Memphis Heart Clinic were performed by a qualified physician.

23.     Relator also asserts that the Memphis Heart Clinic is not a facility with laboratories accredited in vascular technology.   Relator was approached by the Memphis Heart Clinic and asked if he could assist them to become a laboratory accredited in vascular technology.

24.     The vast majority of the noninvasive vascular studies at the Memphis Heart Clinic were not performed by a qualified physician, an accredited vascular technologist, or at a laboratory accredited in vascular technology.   Therefore, the vast majority of noninvasive vascular study claims submitted by the Memphis Heart Clinic to CIGNA, did not qualify for Medicare reimbursement.

25.     As stated by CIGNA in its Article for Noninvasive Vascular Studies, the accuracy of noninvasive vascular diagnostic studies depends on the knowledge, skill and experience of the technologist, and consequently, the technologist and physician must be able to show documentation of training and experience as well as maintain the credentials at each site.   The lack of these credentials was obvious, in that, Relator noticed that the vast majority of noninvasive vascular studies performed at the Memphis Heart Clinic were improperly performed and improperly interpreted by persons not credentialed in vascular technology.

26.     With the exception of the noninvasive vascular studies performed by Relator and one other person, Relator is not aware of any noninvasive vascular studies that were performed under the supervision of persons with the proper credentials or performed by individuals properly credentialed.

27.     Relator witnessed noninvasive vascular studies performed by Mr. Paul Adler who was an ultrasound technologist with the Memphis Heart Clinic.  While Mr. Adler is board certified in echocardiograms, Mr. Adler was not board certified in vascular technology.  Relator personally witnessed Mr. Adler conducting noninvasive vascular studies that were subsequently billed to Medicare.

28.     Relator personally witnessed Ms. Denise Graves conduct noninvasive vascular studies at the Memphis Heart Clinic.  Ms. Graves is not accredited in vascular technology.

29.     Relator has personal knowledge of several ultrasound technologists who are not accredited in vascular technology providing noninvasive vascular studies for physicians throughout the State of Tennessee.  Physicians and clinics throughout the State of Tennessee who do not maintain their own laboratories hire individuals to perform noninvasive vascular studies on their patients.  These noninvasive vascular studies are not performed by the physician, are not performed at an accredited laboratory and these contracted technologists are not credentialed in vascular technology.   Relator has personal knowledge that the following individuals or clinics either perform studies or contract technologists that do not meet the proper accreditations:

        A.     Ronnie Wright – mobile ultrasound service out of Summerville, Tennessee;

        B.     Derrick Lenegar – provides contract labor for doctors including Dr. Hanasian located in Collierville, Tennessee;

8

      C.    Light Clinic, Germantown, Tennessee; and

      D.    St. John's Clinic, Dyersburg, Tennessee.

30.    Relator also has personal knowledge that the Government Accounting Office (GAO) has promulgated literature regarding the pervasive and systemic use of noninvasive vascular studies that are not medically reasonable or necessary. Particularly, the purpose of the requirement for certifications is because hospitals, clinics, and physicians were and are utilizing improperly experienced and educated individuals to perform noninvasive vascular studies purely to bill Medicare. Noninvasive vascular studies have become a revenue stream versus a medically necessary or reasonable study. As such, the Centers for Medicare and Medicaid Services (CMS) promulgated requirements regarding credentials in an effort to stem unreasonable and unnecessary studies.

31.    CIGNA has failed to properly administer the payment of Medicare claims for noninvasive vascular studies throughout the states of Tennessee, North Carolina, and Idaho. CIGNA has approved, authorized, and caused to be paid, Medicare claims for noninvasive vascular studies performed by non-credentialed technologist at facilities that do not have laboratories accredited in vascular technology, and therefore, do not qualify for Medicare reimbursement.

32.    Relator has personally provided noninvasive vascular services in other states, such as Louisiana (which is administered by a contractor other than CIGNA), and the Medicare claims must be accompanied by the proper credentials of the technologist or the laboratory in order to obtain reimbursement.

## CLAIM FOR RELIEF

### VIOLATION OF 31 §U.S.C. 3729(a)(1) and (a)(2)

33.     Relator incorporates the preceding paragraphs as if fully set forth herein.

34.     Defendant, acting through its employees, officers, agents, and independent contractors knowingly presented or caused to be presented false or fraudulent claims for payment from Medicare.  Defendant, CIGNA, has violated the terms of its contract with the United States Government and has failed to comply with the Medicare Program Integrity Manual, NCDs, LCDs, and LMRPs.  Despite the systemic problem of unnecessary and unreasonable noninvasive vascular studies, CIGNA knowingly presented or caused to be presented to the United States Government a claim for payment of non-reimbursable Medicare claims.

35.     Despite CIGNA's own Article for Noninvasive Vascular Studies and the corresponding NCDs and LCDs, CIGNA has acted with actual knowledge, deliberate ignorance of the truth, or reckless disregard for the truth or falsity of whether a noninvasive vascular study was performed by a qualified physician, credentialed vascular technologist, or by an accredited vascular technology laboratory.

36.     The claims presented by the Defendant were false or fraudulent in that the Defendant knowingly made or caused a false or fraudulent claim to be paid by the United States Government.

37.     The Defendant submitted or caused to be submitted and presented or caused to be presented the false and fraudulent claims for payment or approval.

38.     The false and fraudulent claims authorized and approved by CIGNA were paid by the United States Government.

39.     As a direct and proximate result of paying millions of dollars for unqualified claims which were authorized and approved by CIGNA, the United States Government sustained millions of dollars in damages.

WHEREFORE, Relator demands: (1) judgment against the Defendant in an amount of three times the claims submitted for payment to the United States Government, (2) for a civil penalty against the Defendant in an amount between $5,500.00 and $11,000.00 for each violation of 31 U.S.C. §3729, *et seq.*, (3) for the maximum amount allowed to the *Qui Tam* Plaintiff under 31 U.S.C. §3730(d) of the False Claims Act or any other applicable provision of law, including any alternate remedy provisions, (4) for its court costs and reasonable attorneys fees at prevailing rates, (5) for expenses, and (6) for such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Relator demands a jury trial on all issues for which a jury is available.

Dated:  September 10, 2008.

/s/ Russell A. Wood

Russell A. Wood, Esq. (TN #23102)
**WOOD LAW OFFICE, P.A.**
915 West "B" Street
Russellville, AR 72801
Ph:  (479) 967-9663
Fax:  (479) 967-9664

/s/ Thomas P. Thrash

Thomas P. Thrash (AR#80147)
**THRASH LAW FIRM**
1101 Garland Street
Little Rock, AR 72201
(501) 374-1058

*Attorneys for Relator*

# Exhibit B

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. STEPHEN MCMULLEN | ) ) ) | |
| Relator, | ) ) | |
| vs. | ) ) | Case No._____ |
| THE WEST CLINIC, P.C., d/b/a MEMPHIS HEART CLINIC | ) ) | **TO BE FILED IN CAMERA AND UNDER SEAL** |
| Defendant. | ) ) | Pursuant to 31 U.S.C. § 3730(b)(2) |
| | ) ) ) ) ) | |

**RELATOR'S COMPLAINT FOR DAMAGES
UNDER THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ*.**

Relator, Stephen McMullen, for his cause of action states as follows against Defendant The West Clinic, P.C., d/b/a Memphis Heart Clinic ("Memphis Heart Clinic").

**CAUSE OF ACTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false or fraudulent Medicare claims by Defendant.  This is a cause of action brought by Relator pursuant to 31 U.S.C. § 3729 and the *qui tam* provisions of that statute found at 31 U.S.C. §§ 3730 and 3731.

2.     31 U.S.C. § 3730(b)(2) provides that "[t]he complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.  The Government may elect to intervene and proceed with the action within 60

days after it receives both the complaint and the material evidence and information." Plaintiff is filing this matter under seal.

    3.     A copy of the evidentiary disclosure required by the False Claims Act has already been served on the United States.

## JURISDICTION AND VENUE

    4.     This Court has subject matter jurisdiction over this matter because the claim for relief arises under 31 U.S.C. § 3729, *et seq*. Venue is proper in this district pursuant to 31 U.S.C. § 3732 because Defendants transact business in this judicial district.

## PARTIES

    5.     At all times relevant hereto, Relator Stephen McMullen ("Relator") was a citizen and resident of the State of Tennessee and was employed by Memphis Heart Hospital in Memphis, Tennessee. Relator has witnessed the events as set forth herein. Relator is currently a resident of the State of Washington.

    6.     The West Clinic, P.C. is a for profit, domestic corporation with its principal place of business located at 100 N. Humphreys, Memphis, TN 38120. Defendant Memphis Heart Clinic is also located at 100 N. Humphreys, Memphis, Tennessee 38120. Memphis Heart Clinic is in the business of providing medical services for patients including Medicare reimbursable services in Tennessee.

## BACKGROUND FACTS

    7.     Pursuant to Title XVIII of the Social Security Act, §1833(e) states, "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such

provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."

8.    The primary authority for all Medicare coverage provisions and subsequent policies is the Social Security Act.  Contractors use Medicare policies in the form of regulations, National Coverage Determinations ("NCDs"), coverage provisions in interpretative manuals, and Local Coverage Determinations ("LCDs"), to apply the provisions of the Social Security Act.

9.    The NCDs are developed by the Center for Medicare and Medicaid Services ("CMS") to describe the circumstances for Medicare coverage nationwide for a specific medical service procedure or device.  NCDs outline the conditions for which services consider to be covered (or not covered) under §1862(a)(1) of the Social Security Act or other applicable provisions of the Social Security Act.  NCDs are issued as a program instruction.  Once published in a CMS program instruction, an NCD is binding on all Medicare carriers and providers.

10.    When a new NCD is published, the contractor shall notify the provider community as soon as possible of the change and corresponding effective date.  This is a Provider Communications (PCOM) activity.  Within thirty (30) calendar days after an NCD is issued by CMS, contractors shall either publish the NCD on the contractor website or link to the NCD from the contractor website.  Medicare Program Integrity Manual, Ch. 13.1.1 – National Coverage Determinations.

11.    The contractor *shall* apply NCDs when reviewing claims for services addressed by NCDs.  When making individual claims determinations, contractors have no authority to deviate from NCDs if absolute words such as "never" or "only if" are used in the policy. Medicare Program Integrity Manual, Ch. 13.1.1 – National Coverage Determinations.

12.     Section 522 of the Benefits Improvement and Protection Act created the term "Local Coverage Determination" (LCD).  An LCD is a decision by a Medicare administrative contractor or carrier whether to cover a particular service in accordance with §1862(a)(1)(A) of the Social Security Act.  The difference between a Local Medical Review Policy (LMRP) and LCDs is that LCDs consist of only "reasonable and necessary" information, while LMRPs may also contain benefit category and statutory exclusion provisions.  Beginning in 2003, contractors began issuing LCDs insead of LMRPs and were instructed to convert all existing LMRPs into LCDs.  Medicare Program Integrity Manual, Ch. 13.1.3.

13.     The LCDs specify under what clinical circumstances a service is considered to be reasonable and necessary and are administrative and educational tools to assist providers in submitting correct claims for payment.  Contractors, such as CIGNA, publish LCDs to provide guidance to the public and medical community within their jurisdictions.  Contractors develop LCDs by considering medical literature, advice of local medical societies and medical consultants, public comments, and comments from the provider community.  The contractor is required to adopt LCDs that have been developed individually or collaboratively with other contractors.  The contractor shall ensure that all LCDs are consistent with all statutes, rulings, regulations, and national coverage, payment, and coding policies.  Medicare Program Integrity Manual, Ch. 13.1.3 – Local Coverage Determinations.

14.     Contractors shall ensure that the LCDs appearing on the contractor's LCD website and the LCDs appearing in the Medicare Coverage Database are identical.  Medicare Program Integrity Manual, Ch. 13.4 – When to Develop New/Revised LCDs.

15.     Contractors shall ensure that LCDs are developed for services only within their jurisdiction.  The LCD shall be clear, concise, properly formatted and not restricted to conflict

4

with NCDs or coverage provisions in interpretative manuals.   Medicare Program Integrity Manual, Ch. 13.5 – Content of an LCD.

16.     A service may be covered by a contractor if it is reasonable and necessary under 1862(a)(1)(A) of the Social Security Act.   Only reasonable and necessary provisions are considered part of the LCD.   In order to be covered under Medicare, a service must be be *reasonable* and *necessary*.   When appropriate, contractors shall describe the circumstances under which the proposed LCD for the service is considered *reasonable* and *necessary*.   Medicare Program Integrity Manual, Ch. 13.5.1 – Reasonable and Necessary Provisions in LCDs.

17.     CIGNA has issued LCDs regarding noninvasive vascular studies in Tennessee, Idaho and North Carolina.   Attached as Exhibit A is the Article for Noninvasive Vascular Studies (A34531) which address the reasonable and necessary status of noninvasive vascular studies. See Exhibit A, attached.

18.     According to the Article for Noninvasive Vascular Studies, noninvasive vascular studies include the performance of the studies and patient care required to perform the studies, supervision of the studies and interpretation of the study results with copies for patient records of hardcopy output or imaging when provided.   It is the responsibility of the provider to ensure the medical necessity of procedures and to maintain a record for possible audit.   Noninvasive vascular studies are medically necessary only if the outcome will potentially impact the diagnosis or clinical course of the patient.

19.     The Article for Noninvasive Vascular Studies states as follows:

> It is the responsibility of the provider to ensure the medical necessity of procedures and to maintain a record for possible audit. Noninvasive vascular studies are medically necessary only if the outcome will potentially impact the diagnosis or clinical course of the patient.   Clinicians billing Medicare are encouraged to obtain additional information from referring providers and/or patients or

5

medical records to determine the medical necessity of the study. *Referring physicians are required to provide appropriate diagnostic information to the performing technologist/physician.*

Title XVIII of the Social Security Act Section 1862(a)(7) <u>excludes routine physical examination and screening tests performed in the absence of signs or symptoms from coverage.</u>

### Facts Pertaining To Relator Stephen McMullen

20.     Relator, Stephen McMullen, is an original source who has direct and independent knowledge of the information on which the allegations in this Complaint are based and has voluntarily provided the information to the government before filing an action based on the information contained herein.

21.     Relator, Stephen McMullen, worked for the Memphis Heart Clinic in Memphis, Tennessee from approximately June 2008 through August 2008.   Relator is a Registered Vascular Technologist (RVT) credentialed and accredited by the American Registry of Diagnostic Medical Sonographers.

22.     Typically, a physician will see a patient and send an Order with the appropriate diagnostic information to a registered vascular technologist to perform a scan, i.e. noninvasive vascular study.  Once the study is concluded, the technologist then selects the appropriate ICD-9 code based on diagnostic information provided by the physician which indicates the reason for performing the test.  This ICD-9 Code is used for Medicare billing purposes.  Pursuant to CIGNA's Article for Noninvasive Vascular Studies, the referring physician is *required* to provide this diagnostic information so the technologist can select the appropriate ICD-9 code. Technologist do not have the appropriate training or education to determine the reason for the requested study or the training or education to determine whether the requested study is

6

medically necessary.  The technologist cannot determine the appropriate ICD-9 Code with the diagnostic information provided by the physician.

23.     Relator has personal knowledge that the physicians at the Memphis Heart Clinic routinely do not include the required diagnostic information to the technologist performing the noninvasive vascular study.  Pursuant to policy, custom, or procedure of the Memphis Heart Clinic, the technologists are none-the-less required to select an ICD-9 code which will qualify for Medicare coverage reimbursement.

24.     Relator personally witnessed numerous technologists simply guessing at an ICD-9 code which would qualify for Medicare coverage reimbursement.  Additionally, Relator had conversations with technologists wherein he was told that it was common practice for the technologists to just choose an ICD-9 code which would qualify for Medicare coverage reimbursement, regardless of whether it matched the reason for the requested study.

25.     For example, Relator witnessed and was aware of situations where a physician would order an arterial lower extremity study on a patient.  However, the physician did not provide any diagnostic information in the Order to allow the technologist to select the appropriate ICD-9 code.  In this particular type of circumstance, Relator witnessed that the most popular ICD-9 code selected by technologists was claudication, which is a Medicare approved study.  The technologist had no way of determining whether claudication was the appropriate reason for the study, but selected this ICD-9 code because they are required to select an ICD-9 code which would qualify for Medicare coverage reimbursement and because claudication is a popular code for arterial lower extremity studies.

26.     The random selection of ICD-9 codes by technologists is a widely known custom at Memphis Heart Clinic and is known by employees such as Paul Adler, Denise Graves and

others.   Routinely, orders from physicians would not include the necessary diagnostic information and the selected ICD-9 code qualifying for Medicare coverage reimbursement would not match the reason for the patient study.

27.   Relator was advised by technologists employed at the Memphis Heart Clinic that they would receive interoffice e-mail from the hospital administration or billing department when the technologists selected non-reimbursable ICD-9 codes, requiring them to change the ICD-9 code to a Medicare reimbursable category.

28.   It is the custom of technologists at Memphis Heart Clinic to randomly select Medicare reimbursable ICD-9 codes despite not having any diagnostic information from the referring physician or any reason for the study.   Technologists are required to select Medicare reimbursable ICD-9 codes without the required diagnostic information or without regard to the stated diagnostic information in the file in order to satisfy the directives of the administration and/or billing department of Memphis Heart Clinic.

29.   A review of the medical files of the Memphis Heart Clinic will reveal that Medicare has been billed and has paid for noninvasive vascular studies which (1) have no diagnostic support for the Medicare coverage qualification and/or (2) the diagnostic information in the study orders does not support Medicare coverage qualification.

## CLAIM FOR RELIEF

### VIOLATION OF 31 §U.S.C. 3729(a)(1), (a)(2), and (a)(3)

30.   Relator incorporates the preceding paragraphs as if fully set forth herein.

31.   Defendant, acting through its employees, officers, agents, and independent contractors knowingly presented or caused to be presented false or fraudulent claims for payment

8

from Medicare. Defendant knowingly presented or caused to be presented to the Unites States Government claims for payment of non-reimbursable Medicare claims.

32. Despite CIGNA's Article for Noninvasive Vascular Studies and the corresponding NCDs and LCDs, Defendant has acted with actual knowledge, deliberate ignorance of the truth, or reckless disregard for the truth or falsity in presenting inaccurate, false, and unsubstantiated claims for Medicare reimbursement.

33. The claims presented by the Defendant were false or fraudulent in that the Defendant knowingly made or caused false or fraudulent claims to be paid by the United States Government.

34. The Defendant submitted or caused to be submitted and presented or caused to be presented the false and/or fraudulent claims or false records for payment or approval.

35. Memphis Heart Clinic also conspires to defraud the U.S. Government by causing its employees to change ICD-9 codes to Medicare reimbursable codes in order to ensure payment by the U.S. Government.

36. The false and fraudulent claims of the Memphis Heart Clinic were paid by the United States Government.

37. As a direct and proximate result of paying unreasonable or unnecessary studies which were, in fact, false or fraudulent, the United States Government sustained damages.

WHEREFORE, Relator demands: (1) judgment against the Defendant in an amount of three times the claims submitted for payment to the United States Government, (2) for a civil penalty against the Defendant in an amount between $5,500.00 and $11,000.00 for each violation of 31 U.S.C. §3729, *et seq.*, (3) for the maximum amount allowed to the *Qui Tam* Plaintiff under 31 U.S.C. §3730(d) of the False Claims Act or any other applicable provision of law, including

9

any alternate remedy provisions, (4) for its court costs and reasonable attorneys fees at prevailing rates, (5) for expenses, and (6) for such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Relator demands a jury trial on all issues for which a jury is available.

Dated:  September 10, 2008.

/s/ Russell A. Wood
Russell A. Wood, Esq. (TN #23102)
**WOOD LAW OFFICE, P.A.**
915 West "B" Street
Russellville, AR 72801
Ph:  (479) 967-9663
Fax:  (479) 967-9664


/s/ Thomas P. Thrash
Thomas P. Thrash (AR#80147)
**THRASH LAW FIRM**
1101 Garland Street
Little Rock, AR 72201
(501) 374-1058

*Attorneys for Relator*

# Exhibit C



**N00062003**

**CERTIFICATE OF CORPORATE RECORDS**

**ASCENSION HEALTH**

I,  JASON KANDER, Secretary of the State of the State of Missouri
and Keeper of the Great Seal thereof, do hereby certify that
the annexed pages contain a full, true and complete copy of
the original documents on file and of record in this office
for which certification has been requested.

IN TESTIMONY WHEREOF,  I have set my
hand and imprinted the GREAT SEAL of
the State of Missouri,  on this,
the 13th day of June, 2013



_____

Secretary of State

Certification Number: 15451828-1     Reference:
Verify this certificate online at https://www.sos.mo.gov/businessentity/soskb/verify.asp



# State of Missouri
**Robin Carnahan, Secretary of State**

Corporations Division
PO Box 778 / 600 W. Main St., Rm. 322
Jefferson City, MO 65102

## Articles of Amendment
## for a Nonprofit Corporation
*(Submit with filing fee of $10.00)*

The undersigned corporation, for the purpose of amending its articles of incorporation, hereby executes the following articles of amendment:

1. The name of corporation is: <u>Ascension Health</u>      <u>N00062003</u>
                              *Name*                                                  *Charter Number*

2. The amendment was adopted on <u>September 7, 2011</u> and changed article(s) <u>Articles I through VII</u> to state as follows:
                                   *month/day/year*

    See attached Amended and Restated Articles of Incorporation of Ascension Health

3. If approval of members was not required, and the amendment(s) was approved by a sufficient vote of the board of directors or incorporators, check here and skip to number (5): ☐ _____

4. If approval by members was required, check here and provide the following information: ☒
    A. Number of memberships outstanding:
    B. Complete either C or D:
    C. Number of votes for and against the amendments(s) by class was:

| Class | Number entitled to vote | Number voting for | Number voting against |
|---|---|---|---|
| 1 | 1 | 1 | 0 |
| | | | |
| | | | |

    D. Number of undisputed votes cast for the amendment(s) was sufficient for approval, and was:

| Class: | Number Voting undisputed: |
|---|---|
| 1 | 1 |
| | |
| | |

The number of votes cast in favor of the amendment(s) by each class was sufficient for approval by that class.

5. If approval of the amendment(s) by some person(s) other than the members, the board or the incorporators was required pursuant to section 355.606, check here to indicate that approval was obtained: ☒

In Affirmation thereof, the facts stated above are true and correct:
(The undersigned understands that false statements made in this filing are subject to the penalties provided under Section 575.040, RSMo)

_____    Joseph R. Impicciche    Sr. VP, Legal Services &    12/07/11
*Authorized signature of officer or chairman of the board*    *Printed Name*          *Title* Gen. Counsel      *Date*

Name and address to return filed document:

Name: _____

Address: _____

City, State, and Zip Code: _____

State of Missouri
Amend/Restate - NonProfit 6 Page(s)

# AMENDED & RESTATED
## ARTICLES OF INCORPORATION
### OF
## ASCENSION HEALTH

Ascension Health hereby amends and restates the provisions of its Articles of Incorporation in respects which are authorized under the Missouri Nonprofit Corporation Act (hereinafter referred to as "Act"), as follows:

## ARTICLE I

## GENERAL

1.1     **Name.** The name of the corporation is Ascension Health.

1.2     **Classification.** Ascension Health is a public benefit corporation.

1.3     **Definitions.** Capitalized words and phrases not otherwise defined herein shall have the meanings ascribed thereto in the Bylaws of Ascension Health.

1.4     **Period of Existence.** The period during which Ascension Health shall continue is perpetual.

## ARTICLE II

## PURPOSES

2.1     **Purposes.** The purposes for which Ascension Health is organized are exclusively charitable, religious, scientific or educational within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or the corresponding provision of any future United States Internal Revenue Law (the "Code")). Further, Ascension Health is organized and at all times shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of Ascension Health Ministries (referred to as the "Sponsor"), which has been conferred public juridic personality by decree of The Congregation for Institutes of Consecrated Life and Societies of Apostolic Life of the Roman Catholic Church, and to advance the Sponsor's religious purposes. Ascension Health shall also be operated for the benefit of organizations affiliated with the Sponsor, provided that such organizations are described under Section 501(c)(3) of the Code and are classified as public charities under Sections 509(a)(1) and 509(a)(2) of the Code. In furtherance of these purposes and consistent with the official teachings of the Roman Catholic Church, Ascension Health may:

    2.1.1    Serve as the parent corporation for Health Ministries sponsored by Ascension Health Ministries.

    2.1.2    Serve in the health ministry of the Roman Catholic Church, carry out its mission and ensure that the elements of Catholic identity are integrated and implemented

throughout the health ministry, including the *Ethical and Religious Directives for Catholic Health Care Services,* as approved, from time to time, by the United States Conference of Catholic Bishops and as implemented by the local ordinary.

**2.1.3** Promote, support and engage in any and all religious, educational, charitable and scientific ministries as determined by the Sponsor.

**2.1.4** Further the mission of the Sponsor by participating in a sponsored nationally integrated health system through which the Sponsor can faithfully fulfill its stewardship obligations and through which its sponsored institutions can continue to operate efficiently and effectively.

**2.1.5** Raise funds from the public and from all other sources available; receive and maintain such funds and expend principal and income therefrom.

**2.1.6** Engage in any lawful activities within the purposes and powers for which a corporation may be organized under the Act.

**2.1. 7** Otherwise operate exclusively for charitable, religious, scientific and educational purposes within the meaning of Section 501(c)(3) of the Code, in the course of which operation and as authorized under the Code:

(i) No part of the net earnings of Ascension Health shall inure to the benefit of, or be distributable to, any private shareholder or individual, except that Ascension Health shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein and as authorized under the Code.

(ii) No substantial part of the activities of Ascension Health shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and Ascension Health shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of or in opposition to any candidate for public office.

(iii) Notwithstanding any other provisions of these Articles, Ascension Health shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Code, or (b) by a corporation, contributions to which are deductible under Section 170( c )(2) of the Code.

## ARTICLE III

### REGISTERED AGENT AND REGISTERED OFFICE

**3.1** **Registered Agent.** The name and address of Ascension Health's registered agent for service of process is Joseph R. Impicciche, 4600 Edmundson Road, St. Louis, Missouri, 63134.

**3.2** **Registered Office.** The address of the principal office of Ascension Health is 4600 Edmundson Road, St. Louis, Missouri 63134.

## ARTICLE IV

## MEMBERSHIP

**4.1** **Number and Eligibility.** Ascension Health shall have one Member: Ascension Health Alliance, a Missouri nonprofit corporation (hereinafter referred to as the "Member").

**4.2** **Meetings.** Meetings of the Member shall be held at such place, either within or outside the State of Missouri, as shall be specified in its calls, notices and waivers of notice.

## ARTICLE V

## BOARD OF TRUSTEES

**5.1** **Number.** The Board of Trustees shall consist of not fewer than nine (9) or more than thirteen (13) Trustees as shall be fixed from time to time by the Member.

**5.2** **Reserved Powers of Member.** The following powers are reserved to the Member:

**5.2.1** Approve, assure compliance with, change, and interpret the philosophy, mission, vision, expectations and core values of the Ascension Health.

**5.2.2** Approve the Articles of Incorporation and Bylaws of Ascension Health.

**5.2.3** Appoint, upon the recommendation of the Board of Ascension Health, or remove, with or without cause, the members of the Board of Trustees of Ascension Health, subject to ratification by Ascension Health Ministries.

**5.2.4** Appoint, upon the recommendation of the Board, or remove, with or without cause, after consultation with the Board, the Chair of the Board of Directors of Ascension Health, subject to ratification by Ascension Health Ministries.

**5.2.5** Subject to the approval of Ascension Health Ministries, approve the alienation of assets of as required by Canon law.

**5.2.6** Approve the sale, transfer or substantial change in use of all or substantially all of the assets of Ascension Health or any Credit Group Member, and approve the merger, dissolution or consolidation of Ascension Health or any Credit Group Member and the disposition of assets of Ascension Health or any Credit Group Member upon dissolution.

**5.2.7** Approve the Integrated Strategic, Financial and Operating Plan of Ascension Health and its Subsidiary Organizations ("Ascension ISOFP") and the capital allocation for Ascension Health.

**5.2.8**   Approve the incurrence of debt by Ascension Health and by any of its Subsidiary Organizations.

## ARTICLE VI

### ORIGINAL INCORPORATORS

**6.1**   The original incorporators are as follows:

> Donald A. Brennan
> 4600 Edmundson Road
> St. Louis, Missouri 63134
>
> John S. Lore
> 455 E. Eisenhower Parkway, Suite 300
> Ann Arbor, Michigan 48108-3304

## ARTICLE VII

### PROVISIONS FOR REGULATION AND CONDUCT
### OF THE AFFAIRS OF ASCENSION HEALTH

**7.1**   **Bylaws.** The power to approve changes to the Bylaws of Ascension Health shall be vested in the Member.

**7.2**   **Meetings by Telecommunications Device.** Board members may participate in and act at any meeting of the Board of Trustees by means of conference telephone or similar communications equipment if all persons participating in the meeting can hear each other simultaneously. Participation by such means shall constitute presence in person at the meeting.

**7.3**   **Meetings of the Board.** Regular meetings of the Board of Trustees shall be held at such time and place as the Board of Trustees shall from time to time determine. Said meetings may be held within or without the State of Missouri.

**7.4**   **Dissolution.** In the event of the dissolution of Ascension Health, the Member, after paying or making provision for the payment of all of the liabilities of Ascension Health, shall distribute, in accordance with a dissolution and unwinding plan developed by the Member, all of the assets of Ascension Health to the Member or organizations designated by the Sponsor which are organized and operated exclusively for charitable, religious, educational or scientific purposes as shall, at the time, qualify as an exempt organization or organizations under Section 501(c)(3) of the Code. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of Ascension Health is then located exclusively for such purposes or to such organization or organizations, as such court shall determine, which are organized and operated exclusively for such purposes.

Ascension Health, through an affirmative vote of its Board of Trustees and Member, does hereby adopt these Articles of Incorporation as the Amended and Restated Articles of Incorporation of Ascension Health and states that they supercede and take the place of the existing Amended and Restated Articles of Incorporation of Ascension Health.

Executed:  This 7th day of December, 2011.

**ASCENSION HEALTH**

Joseph R. Impicciche, Esq.
Senior Vice President Legal Services
and General Counsel

# State of Missouri



## Robin Carnahan
## Secretary of State

### CERTIFICATE OF AMENDMENT AND RESTATEMENT
### OF A Non-Profit Corporation

WHEREAS,

*ASCENSION HEALTH*
*N00062003*

a corporation organized under The Missouri Nonprofit Corporation Law has delivered to me
Articles of Amendment and Restatement of its Articles of Incorporation and has  in all respects
complied with the requirements of law governing the Amendment and Restatement of Articles of
Incorporation under The Missouri Nonprofit Corporation Law, and that the Articles of
Incorporation of said corporation are amended and restated in accordance therewith.

IN TESTIMONY WHEREOF, I hereunto
set my hand and cause to be affixed the
GREAT SEAL of the State of Missouri.
Done at the City of Jefferson, this
13th day of December, 2011.



_____
Secretary of State

# Exhibit D

Consolidated Financial
Statements and Supplementary
Information

Ascension Health Alliance
Years Ended June 30, 2012 and 2011
With Reports of Independent Auditors

Ascension Health Alliance

Consolidated Financial Statements
and Supplementary Information

Years Ended June 30, 2012 and 2011

# Contents

Report of Independent Auditors.................................................................................................1

Consolidated Financial Statements

Consolidated Balance Sheets .................................................................................................2
Consolidated Statements of Operations and Changes in Net Assets .............................................4
Consolidated Statements of Cash Flows................................................................................6
Notes to Consolidated Financial Statements.............................................................................8

Supplementary Information

Report of Independent Auditors on Supplementary Information .................................................59
Schedule of Net Cost of Providing Care of Persons Living in Poverty
  and Community Benefit Programs ......................................................................................60
Credit Group Financial Statements:
  Consolidated Balance Sheets .........................................................................................61
  Consolidated Statements of Operations and Changes in Net Assets ........................................63
  Schedule of Credit Group Cash and Investments ...............................................................65



**Ernst & Young LLP**
The Plaza in Clayton Suite 1300
190 Carondelet Plaza
St. Louis, MO 63105-3434

Tel: +1 314 290 1000
Fax: +1 314 290 1882
www.ey.com

# Report of Independent Auditors

The Board of Directors
Ascension Health Alliance

We have audited the accompanying consolidated balance sheets of Ascension Health Alliance (as identified in Note 1) as of June 30, 2012 and 2011, and the related consolidated statements of operations and changes in net assets and cash flows for the years then ended. These financial statements are the responsibility of Ascension Health Alliance's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of Ascension Health Alliance's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Ascension Health Alliance's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Ascension Health Alliance at June 30, 2012 and 2011, and the consolidated results of its operations and changes in net assets and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States.

*Ernst & Young LLP*

September 12, 2012

1202-1331175                                                                                                                1
**Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 41 of 97 PageID #: 240**
A member firm of Ernst & Young Global Limited

Ascension Health Alliance

Notes to Consolidated Financial Statements
*(Dollars in Thousands)*

June 30, 2012

## 1. Organization and Mission

**Organizational Structure**

Ascension Health Alliance is a Missouri nonprofit corporation formed on September 13, 2011. Ascension Health Alliance is the sole corporate member and parent organization of Ascension Health, a Catholic national health system consisting primarily of nonprofit corporations that own and operate local healthcare facilities, or Health Ministries, located in 21 of the United States and the District of Columbia.

In addition to serving as the sole corporate member of Ascension Health, Ascension Health Alliance serves as the member or shareholder of various other subsidiaries, including Ascension Health Global Mission; Ascension Health Insurance, Ltd.; Edessa Insurance Company, Ltd.; the Resource Group, LLC; Clinical Holdings Corporation; Catholic Healthcare Investment Management Company (CHIMCO); Ascension Health Ventures, LLC; Ascension Health Leadership Academy, LLC; and AH Holdings, LLC. Ascension Health Alliance and its member organizations are referred to collectively as the System.

**Sponsorship**

Ascension Health Alliance is sponsored by Ascension Health Ministries, a Public Juridic Person. The Participating Entities of Ascension Health Ministries are the Daughters of Charity of St. Vincent de Paul in the United States, St. Louise Province, the Congregation of St. Joseph, the Congregation of the Sisters of St. Joseph of Carondelet, and the Congregation of Alexian Brothers of the Immaculate Conception Province – American Province. As more fully described in the Organizational Changes note, Alexian Brothers Health System, which was previously sponsored by the Congregation of Alexian Brothers of the Immaculate Conception Province – American Province, became part of Ascension Health on January 1, 2012.

**Mission**

The System directs its governance and management activities toward strong, vibrant, Catholic Health Ministries united in service and healing, and dedicates its resources to spiritually centered care which sustains and improves the health of the individuals and communities it serves. In accordance with the System's mission of service to those persons living in poverty and other vulnerable persons, each Health Ministry accepts patients regardless of their ability to pay. The

# Exhibit E

 **The Joint Commission**   HELPING HEALTH CARE ORGANIZATIONS HELP PATIENTS

 **Quality Check**

## Accreditation Quality Report

> Summary of Accreditation Quality Information

> Accredited Programs

> Accreditation National Patient Safety Goals

> Sites and Services

> Accreditation History

> Download Accreditation PDF Report

> Download Accreditation PDF Report - Include Quarterly Data

> Accreditation Quality Report User Guide

## Certification Quality Report

> View Certification Quality Report

### Quality Report

### Summary of Quality Information



**Baptist Hospital**
Org ID: 7884
2000 Church Street
Nashville, TN 37236
(615)284-5555
www.baptisthospital.com

| Accreditation Programs | Accreditation Decision | Effective Date | Last Full Survey Date | Last On-Site Survey Date |
|---|---|---|---|---|
| 🟡 Hospital | Accredited | 4/9/2011 | 4/8/2011 | 4/8/2011 |

**Accreditation programs recognized by the Centers for Medicare and Medicaid Services (CMS)**
Hospital

| Advanced Certification Programs | Certification Decision | Effective Date | Last Full Review Date | Last On-Site Review Date |
|---|---|---|---|---|
| 🟡 Inpatient Diabetes | Certification | 6/2/2012 | 6/1/2012 | 6/1/2012 |
| 🟡 Primary Stroke Center | Certification | 6/2/2012 | 6/1/2012 | 6/1/2012 |

| Certified Programs | Certification Decision | Effective Date | Last Full Review Date | Last On-Site Review Date |
|---|---|---|---|---|
| 🟡 Joint Replacement - Hip | Certification | 6/2/2012 | 6/1/2012 | 6/1/2012 |
| 🟡 Joint Replacement - Knee | Certification | 6/2/2012 | 6/1/2012 | 6/1/2012 |

**- Top -**

### Symbol Key

⭐ This organization achieved the best possible results

➕ This organization's performance is above the target range/value.

✔️ This organization's performance is similar to the target range/value.

➖ This organization's performance is below the target range/value.

🚫 This measure is not applicable for this organization.

◐ Not displayed

### Footnote Key

1. The measure or measure set was not

### National Patient Safety Goals and National Quality Improvement Goals

Compared to other Joint Commission Accredited Organizations

| | | | Nationwide | Statewide |
|---|---|---|---|---|
| **Hospital** | 2011 National Patient Safety Goals | See Detail | ✔️ | N/A * |
| Reporting Period: Oct 2011 - Sep 2012 | National Quality Improvement Goals: | | | |
| | Heart Attack Care | See Detail | ➕ | ➕ |
| | Heart Failure Care | See Detail | ✔️ | ✔️ |
| | Pneumonia Care | See Detail | ➕ | ➕ |
| | Surgical Care Improvement Project (SCIP) | | | |
| | SCIP - Cardiac | See Detail | | |

2. The measure set does not have an overall result.

3. The number is not enough for comparison purposes.

4. The measure meets the Privacy Disclosure Threshold rule.

5. The organization scored above 90% but was below most other organizations.

6. The measure results are not statistically valid.

7. The measure results are based on a sample of patients.

8. The number of months with measure data is below the reporting requirement.

9. The measure results are temporarily suppressed pending resubmission of updated data.

10. Test Measure: a measure being evaluated for reliability of the individual data elements or awaiting National Quality Forum Endorsement.

| | | | |
|---|---|---|---|
| SCIP - Infection Prevention *For All Reported Procedures:* | See Detail | ⊕ | ⊕ |
| • Blood Vessel Surgery | See Detail | ✓ | ✓ |
| • Colon/Large Intestine Surgery | See Detail | ⊕ | ⊕ |
| • Coronary Artery Bypass Graft | See Detail | ✓ | ✓ |
| • Hip Joint Replacement | See Detail | ⊕ | ⊕ |
| • Hysterectomy | See Detail | ⊕ | ⊕ |
| • Knee Replacement | See Detail | ⊕ | ⊕ |
| • Open Heart Surgery | See Detail | ⊕ | ⊕ |
| SCIP – Venous Thromboembolism (VTE) | See Detail | | |

**Survey of Patients' Hospital Experiences (see details)**

Hospitals voluntarily participate in the Survey of Patients' Hospital Experiences(HCAHPS). Pediatric and psychiatric hospitals are not eligible to participate in the HCAHPS survey based on their patient population.

The Joint Commission only reports measures endorsed by the National Quality Forum.

* State results are not calculated for the National Patient Safety Goals.

- Top -

## Sites and Services
**\* Primary Location**

An organization may provide services not listed here. For more information refer to the Quality Report User Guide .

**Locations of Care**

Baptist Hospital  \*
2000 Church Street
Nashville, TN  37236

**Available Services**

**Joint Commission Advanced Certification Programs:**
- Inpatient Diabetes
- Primary Stroke Center

**Joint Commission Certified Programs:**
- Joint Replacement - Hip
- Joint Replacement - Knee

**Services:**
- Brachytherapy (Imaging/Diagnostic Services)
- Cardiac Catheterization Lab (Surgical Services)
- Cardiac Surgery (Surgical Services)
- Cardiothoracic Surgery (Surgical Services)
- Cardiovascular Unit (Inpatient)
- Coronary Care Unit (Inpatient)
- CT Scanner (Imaging/Diagnostic Services)
- Dialysis Unit (Inpatient)
- Ear/Nose/Throat Surgery (Surgical Services)
- EEG/EKG/EMG Lab (Imaging/Diagnostic Services)
- Gastroenterology (Surgical Services)
- GI or Endoscopy Lab (Imaging/Diagnostic Services)
- Gynecological Surgery (Surgical Services)
- Hematology/Oncology Unit (Inpatient)
- Interventional Radiology

- Neurosurgery (Surgical Services)
- Normal Newborn Nursery (Inpatient)
- Nuclear Medicine (Imaging/Diagnostic Services)
- Orthopedic Surgery (Surgical Services)
- Orthopedic/Spine Unit (Inpatient)
- Pediatric Emergency Medicine (Outpatient - Child/Youth)
- Pediatric General Surgery (Inpatient - Child/Youth) (Outpatient - Child/Youth)
- Pediatric Otolaryngology (Inpatient - Child/Youth) (Outpatient - Child/Youth)
- Plastic Surgery (Surgical Services)
- Positron Emission Tomography (PET) (Imaging/Diagnostic Services)
- Post Anesthesia Care Unit (PACU) (Inpatient)
- Radiation Oncology

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 45 of 97 PageID #: 244

(Inpatient, Outpatient, Imaging/Diagnostic Services)
- Labor & Delivery (Inpatient)
- Magnetic Resonance Imaging (Imaging/Diagnostic Services)
- Medical /Surgical Unit (Inpatient)
- Medical ICU (Intensive Care Unit)
- Neuro/Spine Unit (Inpatient)

(Imaging/Diagnostic Services)
- Sleep Laboratory (Sleep Laboratory)
- Surgical ICU (Intensive Care Unit)
- Surgical Unit (Inpatient)
- Teleradiology (Imaging/Diagnostic Services)
- Thoracic Surgery (Surgical Services)
- Ultrasound (Imaging/Diagnostic Services)
- Urology (Surgical Services)
- Vascular Surgery (Surgical Services)

---

**Baptist Hospital - Diabetes Center**
2010 Church Street
Nashville, TN  37203

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Hospital Outpatient Cardiac Imaging**
222 22nd Avenue North
Nashville, TN  37203

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Medical Plaza I - Life Therapies, Nashville TN**
2011 Church Street, Ste. 105
Nashville, TN  37203

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sport Medicine/Life Therapies - Cool Springs**
101 International Blvd.
Franklin, TN  37067

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Antioch/Lavergne**
3534 Murfreesboro Pike, Ste. 101
Antioch, TN  37013

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Bellevue, Nashville TN**
7640 Highway 70 South, Suite 104
Nashville, TN  37221

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Gordon Jewish Community Center**
801 Percy Warner Blvd.
Nashville, TN  37215

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Lipscomb**
3901 Granny White Pike
Nashville, TN  37215

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Plaza II, Nashville TN**
2021 Church Street
Nashville, TN  37204

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Pleasant View**
254 Ren-Mar Blvd.
Pleasant View, TN  37146

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Rivergate, Madison TN**
1777 Gallatin Pike, North
Madison, TN  37115

**Services:**
- Outpatient Clinics (Outpatient)

---

**Baptist Sports Medicine - Spring Hill, TN**
2009 Wall Street
Spring Hill, TN  37174

**Services:**
- Outpatient Clinics (Outpatient)

---

| | |
|---|---|
| **Baptist Sports Medicine - White House**<br>491 Sage road<br>White House, TN  37188 | **Services:**<br>  &bull; Outpatient Clinics (Outpatient) |
| **Diagnostic Radiology-Franklin**<br>4323 North Carothers Suite 310<br>Franklin, TN  37067 | **Services:**<br>  &bull; Outpatient Clinics (Outpatient) |
| **STHS Heart - Goodlettsville**<br>900 Conference Drive, Ste. 8<br>Goodlettsville, TN  37072 | **Services:**<br>  &bull; Outpatient Clinics (Outpatient) |
| **UT Medical Resident's Clinic**<br>1911 State Street<br>Nashville, TN  37203 | **Services:**<br>  &bull; Outpatient Clinics (Outpatient) |

**- Top -**

The Joint Commission obtains information about accredited/certified organizations not only through direct observations by its employees **...Read more.**

© 2013 The Joint Commission, All Rights Reserved

http://www.qualitycheck.org/qualityreport.aspx?hcoid=7884                          6/17/2013

**Exhibit F**

# Medicare Administrative Contractor Award
## for Jurisdiction 10 Part A/Part B
## (J10 A/B MAC)
## -- CAHABA GOVERNMENT BENEFIT ADMINISTRATORS, LLC --

## Background Sheet

### January 2009

- On January 7, 2009 the Centers for Medicare & Medicaid Services (CMS) announced that Cahaba Government Benefit Administrators, LLC (Cahaba GBA) has been awarded the contract for the combined administration of Part A and Part B Medicare fee-for-service claims in Jurisdiction 10 (J10) comprised of Alabama, Georgia and Tennessee.

- The award of the J10 Part A/Part B Medicare Administrative Contractor (A/B MAC) contract is another step toward improved service to providers, physicians and practitioners as well as greater administrative efficiency and effectiveness for fee-for-service Medicare.

- This award is indicative of the efforts underway to significantly reengineer the Medicare claims administration process and change from the "business as usual" of the past 40 years.

*Background*

- Section 1874A of the Social Security Act, as added by Section 911 of the Medicare Modernization Act of 2003 (MMA) requires the Secretary to take needed steps by 2011 to implement Medicare Contracting Reform and thereby replace all current intermediaries and carriers with MACs through full and open competition as regulated under federal contracting statutes.

- The new MACs are being selected through full and open competitions, and will lead to more efficiency and greater accountability of our fee-for-service contractors in the new environment.

- CMS completed selection activities for the 15 A/B MACs by the end of calendar year 2008 and made award in January 2009.

- The geographical jurisdictions for the MACs were made public on February 22, 2005. The jurisdictions are distinct geographically and non-overlapping.

- When contracting reform is fully implemented, beneficiaries and providers will have separate single points of contact with the Medicare program that will allow for higher quality services to each group.

- In accordance with section 1874A(b)(1)(B) of the Social Security Act, MAC contracts will have to be recompeted no less frequently than once every 5 years.

### The J10 A/B MAC Award

- On August 31, 2007, the Centers for Medicare & Medicaid Services (CMS) released the solicitations for the jurisdictions included in Cycle Two. After careful evaluation that weighed technical qualifications and past performance and considered cost and other factors, CMS established the competitive range. Of those in the competitive range, CMS is awarding the J10 A/B MAC contract to Cahaba GBA whose proposal offered the best overall value to the government.

- The J10 A/B MAC contract is a cost-plus-award-fee contract.

- The J10 A/B MAC will be working with other functional contractors with responsibility for specific administrative activities.

- CMS has significant experience overseeing the implementation of new claims processing contracts and will work to ensure that the hospitals and health care providers, physicians, and the beneficiaries who receive service from the current fiscal intermediaries and carriers in this jurisdiction experience a smooth transition to the new MAC.

### Information Concerning the J10 A/B MAC

- J10 is comprised of Alabama, Georgia and Tennessee.

- The J10 A/B MAC contract has a total estimated value of approximately $335 million over five years.

- The following are the current fiscal intermediaries (FIs) and carriers administering the program in J10 and the states that they serve:
  - Blue Cross and Blue Shield of Georgia, Inc. (FI for Georgia)
  - Cahaba GBA (FI and carrier for Alabama; carrier for Georgia)
  - CIGNA Government Services (carrier for Tennessee)
  - Riverbend Government Benefits Administrator (FI for Tennessee)
  - Wisconsin Physicians Service Insurance Corporation (FI for some providers in Alabama, Georgia and Tennessee)

- Cahaba GBA will implement the J10 A/B MAC by taking over the work from the FIs and carriers on an incremental basis over the next several months.

- Cahaba GBA will be reaching out to providers and state medical associations to provide education and information about the implementation. For more details, visit Cahaba GBA's website at https://www.cahabagba.com/.

- Cahaba GBA will have the following subcontractors:

2

- o Allison Payment Systems, LLC will provide printing and mail services;
  - o Emdeon Business Services will provide intelligent character recognition and data entry services;
  - o Mayer Hoffman McCann will conduct SAS 70 and annual compliance audits; and
  - o Dr. James E. Strong will assist the Contractor Medical Director.

- Cahaba GBA's operations are headquartered in Birmingham AL.

- As of July 2007, approximately 2,864,390 Medicare Fee-for-Service beneficiaries are located in this jurisdiction

- As of July 2007, approximately 73,824 physicians and other medical professionals provided services in this jurisdiction.

- As of December 2007, approximately 458 Medicare hospitals are located in this jurisdiction.

- As of September 2007, approximately 7.2% of the national Medicare claims workload is in this jurisdiction.

- With the award of the contract, one contractor will be performing the work that had been distributed among five. In general, this consolidation of claims administration activities results in an overall reduction in the number of staff that the A/B MAC will need to employ, in comparison to the current FIs and carriers, resulting in reduced costs.

3

# Exhibit G



Create PDF Now

# LCD for Noninvasive Vascular Studies (L1352)

**Please note:** This is a Retired LCD.

## Contractor Information



**Contractor Name**

BlueCross BlueShield of Tennessee (Riverbend Government Benefits Administrator)

**Contractor Number**

00390

**Contractor Type**

FI

## LCD Information



**LCD ID Number**

L1352

**LCD Title**

Noninvasive Vascular Studies

**Contractor's Determination Number**

1352

# LCD Information

## AMA CPT / ADA CDT Copyright Statement

CPT only copyright 2002-2012 American Medical Association. All rights reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein. The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright (c) American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association.

## CMS National Coverage Policy

Title XVIII of the Social Security Act, Section 1862 (a)(1)(A). This section excludes coverage of items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

Title XVIII of the Social Security Act, Section 1862 (a)(7). This section prohibits Medicare payment for any expenses on items and services incurred for routine physical examinations.

Title XVIII of the Social Security Act, Section 1833 (e). This section prohibits Medicare payment for any claim that lacks the necessary information to process the claim.

Medicare Coverage Issue Manual, Section 50-6. This section covers payable procedures and indications for plethysmography.

Medicare Coverage issue Manual, section 50-7. This section covers payable procedures and indications for ultrasound diagnostic procedures.

## Primary Geographic Jurisdiction

Tennessee

## Oversight Region

Region IV

## Original Determination Effective Date

For services performed on or after 12/27/1996

## Original Determination Ending Date

# LCD Information

08/02/2009

## Revision Effective Date

For services performed on or after 09/01/2008

## Revision Ending Date

08/02/2009

## Indications and Limitations of Coverage and/or Medical Necessity

### Description of Noninvasive Vascular Studies

Vascular studies include patient care required to perform the studies, supervision of the studies and interpretation of study results with copies for patient records of hard copy output or imaging when provided. The use of a simple hand-held or other Doppler device that does not produce hard copy output, or that does not permit analysis of bi-directional vascular flow, is considered part of the physical examination of the vascular system and is not separately reimbursable. Doppler procedures performed with zero-crossers (i.e. analog [strip chart recorder] analysis) are also included.

## CEREBROVASCULAR EXAMINATION

### HCPC Codes 93875 and 93880 through 93888

Indications for Cerebrovascular Examination:

1. Cervical bruits

2. Amaurosis fugax

3. Focal cerebral or ocular transient ischemic attacks (i.e., localizing symptoms, weakness of one side of the face, slurred speech, weakness of a limb). Ocular transient ischemic attacks are defined as visual field deficits and not temporary blurred vision.

4. Drop attacks or syncope are rare indications primarily seen with vertebrobasilar or bilateral carotid artery disease. Incoordianation or limb dysfunction should be grouped with unilateral weakness of the face or extremities.

5. CVA

## LCD Information

Examples of Signs and Symptoms That Do Not Demonstrate Medical Necessity:

1. Dizziness is not a typical indication unless associated with other localizing signs or symptoms. However, episodic dizziness with symptom characteristics typical of transient ischemic attacks may indicate medical necessity, especially when other more common sources (e.g., postural hypotension or transiently decreased cardiac output as demonstrated by cardiac events monitoring) have been previously excluded.

2. Headaches are not an indication of extracranial studies.

Acceptable Procedures for Reimbursement:

1. Duplex scan (93880 or 93882)

2. Doppler ultrasound with spectrum analysis (93875)

3. Oculopneumoplethysmography (OPPG) (93875)

4. Periorbital Doppler (93875) when OPPG is contraindicated

5. Transcranial Doppler (TCD) (see below) (93886 or 93888)

Multiple cerebrovascular procedures can be allowed during the same encounter given the provider can demonstrate medical necessity. That is, physiologic studies and a duplex scan are allowed on the same date of service given the provider is able to document medical necessity (e.g., greater than or equal to 50% stenosis on duplex scan or significant symptoms as demonstrated by the indications for the study) on post-payment audit.

Methods not Acceptable for Reimbursement:

1. Pulse delay oculoplethysmography

2. Carotid phonoangiography and other forms of bruit analysis are covered services but are included in the reimbursement for the office visit

3. Periorbital photoplethysmography

Recommendations for Follow-up Studies:

1. Stenosis of 20-50%, an annual study

### LCD Information

2. Stenosis of 50-79%, every six months

3. Stenosis of 80-99%, surgery is usually recommended

4. After carotid endarterectomy, repeat examinations are allowed at six weeks, six months, one year and annually thereafter

**Transcranial Doppler (TCD) (93886 or 93888)**

TCD is an allowed procedure and is of established value in:

1. Detecting severe stenosis (> 65%) in the major basal intracranial arteries

2. Assessing patterns and extent of collateral circulation in patients with known regions of severe stenosis or occlusion

3. Evaluating and following patients with vasoconstriction of any cause especially after subarachnoid hemorrhage

4. Detecting arteriovenous malformations and studying their supply arteries and flow patterns

5. Assessing patients with suspected brain death

6. Shunt study evaluation as the etiology of CVA's

Examples of non-acceptable indications include:

1. Evaluation of brain tumors

2. Assessment of familiar and degenerative diseases of the cerebrum, brainstem, cerebellum, basal ganglia and motor neurons

3. Evaluation of infectious and inflammatory conditions

4. Psychiatric disorders

5. Epilepsy

The following applications are in the research phase and are considered investigational:

1. Assessing patients with migraine

http://coverage.cms.fu.com/mcd_archive/viewlcd_pdf.asp?lcd_id=1352&lcd_version=42&...   6/17/2013

## LCD Information

2. Monitoring during carotid endarterectomy cardiopulmonary bypass and other cerebrovascular and cardiovascular interventions, and surgical procedures

3. Evaluation of patients with dilated vasculopathies such as fusiform aneurysms

4. Assessing autoregulation, physiologic, and pharmacological response of cerebral arteries

5. Evaluating children with various vasculopathies such as sickle cell disease, moya moya, and neurofibromatosis


## PERIPHERAL ARTERIAL EXAMINATION


**HCPC Codes 93922 through 93931**

Noninvasive peripheral arterial examinations, performed to establish the level and/or degree of arterial occlusive disease, are medically necessary if (1) significant signs and/or symptoms of limb ischemia are present and (2) the patient is a candidate for invasive therapeutic procedures. A routine history and physical examination, which includes Ankle/Brachial Indices (ABIs), can readily document the presence or absence of ischemic disease in a majority of cases.

An ABI should be abnormal (i.e., <0.9 at rest) and must be accompanied by another appropriate indication before proceeding to more sophisticated or complete studies, except in patients with severe diabetes resulting in medial calcification as demonstrated by artifactually elevated ankle blood pressures.

Indications for Peripheral Arterial Evaluations

1. Claudication of less than one block or of such severity that it interferes significantly with the patient's occupation or lifestyle. Also abnormal ABIs and/or segmented pressures.

2. Rest pain (typically including the forefoot), usually associated with absent pulses, which becomes increasingly severe with elevation and diminishes with placement of the leg in a dependent position.

3. Tissue loss defined as gangrene or pregangreneous changes of the extremity, or ischemic ulceration of the extremity occurring in the absence of pulses.

4. Aneurysmal disease

5. Evidence of thromboembolic events

6. Blunt or penetrating trauma (including complications of diagnostic and/or therapeutic procedures)

## LCD Information

7. For evaluation of dialysis access, see policy regarding CPT code 93990

Examples of Signs and Symptoms that Do Not Indicate Medical Necessity

1. Continuous burning of the feet is considered to be a neurologic symptom.

2. "Leg Pain, nonspecific," and "Pain in limb" as a single diagnosis are too general to warrant further investigation unless they can be related to other signs and symptoms.

3. Edema rarely occurs with arterial occlusive disease unless it is in the immediate postoperative period, in association with another inflammatory process or in association with rest pain.

4. Absence of relatively minor pulses (i.e., dorsalis pedis or posterior tibial) in the absence of symptoms. The absence of pulses is not an indication to proceed beyond the physical examination unless it is related to other signs and/or symptoms

Acceptable Procedures for Reimbursement

1. Duplex scan (93925, 93926, 93930, or 93931)

2. Single level physiologic studies (e.g., Doppler waveform analysis, volume plethysmography, granscutaneous oxygen tension measurement) (93922)

3. Segmental physiologic studies or with provacative functional maneuvers (93923)

4. Physiologic studies at rest and following treadmill stress testing (93924)

Transcutaneous oxygen tension measurements are acceptable to evaluate healing potential in nonhealing or difficult to heal wounds at a frequency of no greater than twice in any 60 day period.

Duplex scanning and physiologic studies are reimbursed during the same encounter if the physiologic studies are abnormal and/or to evaluate vascular trauma, thromboembolic events or aneurysmal disease.

Methods Not Acceptable for Reimbursement

1. Mechanical Oscillometry

2. Inductance Plethysmography

**LCD Information**

3. Capacitance Plethysmography

4. Photoelectric Plethysmography

5. ABI (considered part of the physical examination)

Post-Intervention Follow-up Studies

Duplex post-interventional follow-up studies are typically limited in scope and unilateral in nature. Consequently, the "complete" duplex scan codes (i.e., 93925 or 93930) should seldom be used while the "unilateral or limited study codes" (i.e., 93926 or 93931) should be typically used:

1. In the immediate post-operative period, patients may be studied if re-established pulses are lost, become equivocal, or if the patient develops related signs and/or symptoms of ischemia with impending repeat intervention.

2. Follow-up studies may be appropriate at three month intervals the first year, six month intervals, the second year and annually thereafter for autogenous bypass surgeries, post-angioplasty and synthetic graft insertions of the lower extremities

Screening of the asymptomatic patient is not covered by Medicare.

## PERIPHERAL VENOUS EXAMINATIONS

**HCPCS Codes 93965 through 93971**

Indications for venous examinations are separated into two major categories: deep vein thrombosis and chronic venous insufficiency. Studies are medically necessary only if the patient is a candidate for anticoagulation or invasive therapeutic procedures.

Since the signs and symptoms of arterial occlusive disease and venous disease are so divergent, the performance of simultaneous arterial and venous studies during the same encounter should be rare. Consequently, a document clearly supporting the medical necessity of both procedures performed during the same encounter must be available for post-payment audit.

**Deep Vein Thrombosis (DVT)**

VT is the most common vascular disorder that develops in hospitalized patients and can develop after trauma or prolonged immobility (sitting or bedrest). Unfortunately, the signs and/or symptoms of DVT are relatively non-specific and, due to the risk associated with pulmonary embolism (PE), objective testing is allowed in patients that are candidates for anticoagulation or invasive therapeutic procedures for the following indications:

## LCD Information

1. Clinical signs and/or symptoms of DVT including edema, tenderness, inflammation, and/or erythema

2. Clinical signs and/or symptoms of PE including hemoptysis, chest pain, pnea, hypoxia and/or respiratory failure

3. Unexplained lower extremity edema status-post major surgical procedures

4. High risk patients: hip surgery, multiple trauma, malignancy, etc.

Bilateral limb edema in the presence of signs and/or symptoms of congestive heart failure. exogenous obesity and/or arthritis should rarely be an indication except in high risk populations (e.g., status-post major surgical procedures).

**Chronic Venous Insufficiency**

Chronic venous insufficiency may be divided into three categories: primary varicose veins, post-thrombotic (post-phlebitic) syndrome, and recurrent DVT. It is not medically necessary to study primary varicose veins. Objective tests of venous function may be indicated in patients with ulceration suspected to be secondary to venous insufficiency in order to confirm this diagnosis by documenting venous valvular incompetence prior to treatment. Evaluation is medically necessary in patients with symptoms of recurrent DVT.

Acceptable Procedures for Reimbursement

1. Duplex scan (93970 or 93971)

2. Doppler waveform analysis including responses to compression and other maneuvers (93965)

3. Impedance Plethysmography (93965)

4. Air Plethysmography (93965)

5. Strain Gauge Plethsmography (93965)

Methods Not Acceptable for Reimbursement

1. Mechanical Oscillometry

2. Inductance Plethysmography

3. Capacitance Plethysmography

## LCD Information

4. Photoelectric Plethysmography

Performance of both duplex scanning (93970 or 93971) and physiological tests (93965) of extremity veins during the same encounter is not medically necessary.

## HEMODIALYSIS ACCESS EXAMINATION

**HCPCS Code 93990**

Limited coverage has been established for duplex scanning of hemodialysis access sites in patients with end stage renal disease (ESRD). These procedures are medically necessary only in the presence of signs or symptoms of possible failure of the access site and when the results may impact the clinical course of the patient.

Appropriate indications for Duplex scan of hemodialysis access sites include:

1. ICD-9-CM code 996.73: Complication (Complication NOS, occlusion NOS, embolism, fibrosis, hemorrhage, pain, stenosis, thrombosis) due to renal dialysis device, implant, and graft.

Clear documentation in the dialysis record of signs of chronic (i.e., 3 successive dialysis sessions) of abnormal function including:

   a. difficult cannulation by multiple personnel

   b. thrombus aspiration by multiple personnel

   c. elevated venous pressure greater than 200 mmHg on a 300 cc/min pump

   d. elevated recirculation time of 15% or greater

   e. low urea reduction rate of less than 60%, or

   f. shunt collapse suggesting poor arterial inflow

Routine evaluation on a daily or weekly basis without evidence of the above is considered screening and is not a covered service.

## ULTRASOUND GUIDED REPAIR OF PSEUDOANEURYSM

**HCPC Code 76936**

Diagnosis of pseudoaneurysm is primarily based on history and physical examination. The code

## LCD Information

76936 includes codes 93926 and 93931, and these procedures are not separately reimbursable.

Acceptable indications include a pulsatile mass indicating a pseudoaneurysm. When performed in conjunction with the invasive procedure, 76936 is considered part of the invasive procedure and is not separately reportable.

## Coding Information



**Bill Type Codes:**

**Contractors may specify Bill Types to help providers identify those Bill Types typically used to report this service. Absence of a Bill Type does not guarantee that the policy does not apply to that Bill Type. Complete absence of all Bill Types indicates that coverage is not influenced by Bill Type and the policy should be assumed to apply equally to all claims.**

| | |
|---|---|
| 12x | Hospital-inpatient or home health visits (Part B only) |
| 13x | Hospital-outpatient (HHA-A also) (under OPPS 13X must be used for ASC claims submitted for OPPS payment -- eff. 7/00) |
| 14x | Non-Patient Laboratory Specimens |
| 15x | Hospital-intermediate care - level I |
| 16x | Hospital-intermediate care - level II |
| 17x | Hospital-intermediate care - level III |
| 18x | Hospital-swing beds |
| 19x | Hospital-reserved for national assignment |
| 21x | SNF-inpatient, Part A |

**Revenue Codes:**

**Contractors may specify Revenue Codes to help providers identify those Revenue Codes typically used to report this service. In most instances Revenue Codes are purely advisory; unless specified in the policy services reported under other Revenue Codes are equally subject to this coverage determination. Complete absence of all Revenue Codes indicates that coverage is not influenced by Revenue Code and the policy should be assumed to apply equally to all Revenue Codes.**

http://coverage.cms.fu.com/mcd_archive/viewlcd_pdf.asp?lcd_id=1352&lcd_version=42&...   6/17/2013

## Coding Information

| | |
|---|---|
| 048X | Cardiology-general classification |
| 0921 | Other diagnostic services-peripheral vascular lab |

### CPT/HCPCS Codes

Ultrasonic Guidance Procedures

| | |
|---|---|
| 76936 | ULTRASOUND GUIDED COMPRESSION REPAIR OF ARTERIAL PSEUDOANEURYSM OR ARTERIOVENOUS FISTULAE (INCLUDES DIAGNOSTIC ULTRASOUND EVALUATION, COMPRESSION OF LESION AND IMAGING) |

Cerebrovascular Arterial Studies

| | |
|---|---|
| 93875 | NONINVASIVE PHYSIOLOGIC STUDIES OF EXTRACRANIAL ARTERIES, COMPLETE BILATERAL STUDY (EG, PERIORBITAL FLOW DIRECTION WITH ARTERIAL COMPRESSION, OCULAR PNEUMOPLETHYSMOGRAPHY, DOPPLER ULTRASOUND SPECTRAL ANALYSIS) |
| 93880 | DUPLEX SCAN OF EXTRACRANIAL ARTERIES; COMPLETE BILATERAL STUDY |
| 93882 | DUPLEX SCAN OF EXTRACRANIAL ARTERIES; UNILATERAL OR LIMITED STUDY |
| 93886 | TRANSCRANIAL DOPPLER STUDY OF THE INTRACRANIAL ARTERIES; COMPLETE STUDY |
| 93888 | TRANSCRANIAL DOPPLER STUDY OF THE INTRACRANIAL ARTERIES; LIMITED STUDY |

Extremity Arterial Studies (Including Digits)

| | |
|---|---|
| 93922 | NONINVASIVE PHYSIOLOGIC STUDIES OF UPPER OR LOWER EXTREMITY ARTERIES, SINGLE LEVEL, BILATERAL (EG, ANKLE/BRACHIAL INDICES, DOPPLER WAVEFORM ANALYSIS, VOLUME PLETHYSMOGRAPHY, TRANSCUTANEOUS OXYGEN TENSION MEASUREMENT) |
| 93923 | NONINVASIVE PHYSIOLOGIC STUDIES OF UPPER OR LOWER EXTREMITY ARTERIES, MULTIPLE LEVELS OR WITH PROVOCATIVE FUNCTIONAL MANEUVERS, COMPLETE BILATERAL STUDY (EG, SEGMENTAL BLOOD PRESSURE MEASUREMENTS, SEGMENTAL DOPPLER WAVEFORM ANALYSIS, SEGMENTAL VOLUME PLETHYSMOGRAPHY, SEGMENTAL TRANSCUTANEOUS OXYGEN TENSION MEASUREMENTS, MEASUREMENTS WITH POSTURAL |

**Coding Information**

PROVOCATIVE TESTS, MEASUREMENTS WITH REACTIVE HYPEREMIA)

93924     NONINVASIVE PHYSIOLOGIC STUDIES OF LOWER EXTREMITY ARTERIES, AT REST AND FOLLOWING TREADMILL STRESS TESTING, COMPLETE BILATERAL STUDY

93925     DUPLEX SCAN OF LOWER EXTREMITY ARTERIES OR ARTERIAL BYPASS GRAFTS; COMPLETE BILATERAL STUDY

93926     DUPLEX SCAN OF LOWER EXTREMITY ARTERIES OR ARTERIAL BYPASS GRAFTS; UNILATERAL OR LIMITED STUDY

93930     DUPLEX SCAN OF UPPER EXTREMITY ARTERIES OR ARTERIAL BYPASS GRAFTS; COMPLETE BILATERAL STUDY

93931     DUPLEX SCAN OF UPPER EXTREMITY ARTERIES OR ARTERIAL BYPASS GRAFTS; UNILATERAL OR LIMITED STUDY

Extremity Venous Studies (Including Digits)
V72.83 is only applicable to 93970 and 93971 when coded with 585.6 or 585.9 Chronic Renal Failure, as the secondary diagnosis. In 2006 must be coded to the fourth position.

93965     NONINVASIVE PHYSIOLOGIC STUDIES OF EXTREMITY VEINS, COMPLETE BILATERAL STUDY (EG, DOPPLER WAVEFORM ANALYSIS WITH RESPONSES TO COMPRESSION AND OTHER MANEUVERS, PHLEBORHEOGRAPHY, IMPEDANCE PLETHYSMOGRAPHY)

93970     DUPLEX SCAN OF EXTREMITY VEINS INCLUDING RESPONSES TO COMPRESSION AND OTHER MANEUVERS; COMPLETE BILATERAL STUDY

93971     DUPLEX SCAN OF EXTREMITY VEINS INCLUDING RESPONSES TO COMPRESSION AND OTHER MANEUVERS; UNILATERAL OR LIMITED STUDY

Visceral and Penile Vascular Studies

93975     DUPLEX SCAN OF ARTERIAL INFLOW AND VENOUS OUTFLOW OF ABDOMINAL, PELVIC, SCROTAL CONTENTS AND/OR RETROPERITONEAL ORGANS; COMPLETE STUDY

93976     DUPLEX SCAN OF ARTERIAL INFLOW AND VENOUS OUTFLOW OF ABDOMINAL, PELVIC, SCROTAL CONTENTS AND/OR RETROPERITONEAL ORGANS; LIMITED STUDY

93978     DUPLEX SCAN OF AORTA, INFERIOR VENA CAVA, ILIAC VASCULATURE, OR BYPASS GRAFTS; COMPLETE STUDY

93979     DUPLEX SCAN OF AORTA, INFERIOR VENA CAVA, ILIAC VASCULATURE, OR BYPASS GRAFTS; UNILATERAL OR LIMITED STUDY

93980

## Coding Information

|        | DUPLEX SCAN OF ARTERIAL INFLOW AND VENOUS OUTFLOW OF PENILE VESSELS; COMPLETE STUDY |
| 93981  | DUPLEX SCAN OF ARTERIAL INFLOW AND VENOUS OUTFLOW OF PENILE VESSELS; FOLLOW-UP OR LIMITED STUDY |

Extremity Arterial-Venous Studies

| 93990 | DUPLEX SCAN OF HEMODIALYSIS ACCESS (INCLUDING ARTERIAL INFLOW, BODY OF ACCESS AND VENOUS OUTFLOW) |

### ICD-9 Codes that Support Medical Necessity

Cerebrovascular Evaluation Indications

| 342.00 - 342.92 | FLACCID HEMIPLEGIA AND HEMIPARESIS AFFECTING UNSPECIFIED SIDE - UNSPECIFIED HEMIPLEGIA AND HEMIPARESIS AFFECTING NONDOMINANT SIDE |
| 344.00 - 344.5 | QUADRIPLEGIA UNSPECIFIED - UNSPECIFIED MONOPLEGIA |
| 344.81 - 344.9 | LOCKED-IN STATE - PARALYSIS UNSPECIFIED |
| 362.30 - 362.37 | RETINAL VASCULAR OCCLUSION UNSPECIFIED - VENOUS ENGORGEMENT OF RETINA |
| 362.84 | RETINAL ISCHEMIA |
| 368.10 | SUBJECTIVE VISUAL DISTURBANCE UNSPECIFIED |
| 368.11 | SUDDEN VISUAL LOSS |
| 368.12 | TRANSIENT VISUAL LOSS |
| 368.40 - 368.47 | VISUAL FIELD DEFECT UNSPECIFIED - HETERONYMOUS BILATERAL FIELD DEFECTS |
| 433.00 - 433.91 | OCCLUSION AND STENOSIS OF BASILAR ARTERY WITHOUT CEREBRAL INFARCTION - OCCLUSION AND STENOSIS OF UNSPECIFIED PRECEREBRAL ARTERY WITH CEREBRAL INFARCTION |
| 434.00 - 434.91 | CEREBRAL THROMBOSIS WITHOUT CEREBRAL INFARCTION - CEREBRAL ARTERY OCCLUSION UNSPECIFIED WITH CEREBRAL INFARCTION |
| 435.0 - 435.9 | BASILAR ARTERY SYNDROME - UNSPECIFIED TRANSIENT CEREBRAL ISCHEMIA |
| 436 | ACUTE BUT ILL-DEFINED CEREBROVASCULAR DISEASE |
| 437.0 | CEREBRAL ATHEROSCLEROSIS |

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 66 of 97 PageID #: 265

**Coding Information**

| | |
|---|---|
| 437.3 | CEREBRAL ANEURYSM NONRUPTURED |
| 442.81 | ANEURYSM OF ARTERY OF NECK |
| 442.82 | ANEURYSM OF SUBCLAVIAN ARTERY |
| 446.0 - 446.7 | POLYARTERITIS NODOSA - TAKAYASU'S DISEASE |
| 780.2 | SYNCOPE AND COLLAPSE |
| 781.2 | ABNORMALITY OF GAIT |
| 781.3 | LACK OF COORDINATION |
| 781.4 | TRANSIENT PARALYSIS OF LIMB |
| 782.0 | DISTURBANCE OF SKIN SENSATION |
| 784.3 | APHASIA |
| 784.5 | OTHER SPEECH DISTURBANCE |
| 785.9 | OTHER SYMPTOMS INVOLVING CARDIOVASCULAR SYSTEM |
| 900.00 - 900.9 | INJURY TO CAROTID ARTERY UNSPECIFIED - INJURY TO UNSPECIFIED BLOOD VESSEL OF HEAD AND NECK |
| 901.1 | INJURY TO INNOMINATE AND SUBCLAVIAN ARTERIES |
| 996.1 | MECHANICAL COMPLICATION OF OTHER VASCULAR DEVICE IMPLANT AND GRAFT |
| 996.70 - 996.99 | OTHER COMPLICATIONS DUE TO UNSPECIFIED DEVICE IMPLANT AND GRAFT - COMPLICATION OF OTHER SPECIFIED REATTACHED BODY PART |
| 998.0 - 998.9 | POSTOPERATIVE SHOCK NOT ELSEWHERE CLASSIFIED - UNSPECIFIED COMPLICATION OF PROCEDURE NOT ELSEWHERE CLASSIFIED |
| V67.00 | FOLLOW-UP EXAMINATION FOLLOWING UNSPECIFIED SURGERY |

Extremity Arterial Evaluation Indications

| | |
|---|---|
| 250.70 - 250.73 | DIABETES WITH PERIPHERAL CIRCULATORY DISORDERS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED - DIABETES WITH PERIPHERAL CIRCULATORY DISORDERS, TYPE I [JUVENILE TYPE], UNCONTROLLED |
| 440.0 | ATHEROSCLEROSIS OF AORTA |
| 440.21 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH INTERMITTENT CLAUDICATION |
| 440.22 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH REST PAIN |

## Coding Information

| | |
|---|---|
| 440.23 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH ULCERATION |
| 440.24 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH GANGRENE |
| 440.29 | OTHER ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES |
| 440.30 | ATHEROSCLEROSIS OF UNSPECIFIED BYPASS GRAFT OF THE EXTREMITIES |
| 440.31 | ATHEROSCLEROSIS OF AUTOLOGOUS VEIN BYPASS GRAFT OF THE EXTREMITIES |
| 440.32 | ATHEROSCLEROSIS OF NONAUTOLOGOUS BIOLOGICAL BYPASS GRAFT OF THE EXTREMITIES |
| 442.0 | ANEURYSM OF ARTERY OF UPPER EXTREMITY |
| 442.3 | ANEURYSM OF ARTERY OF LOWER EXTREMITY |
| 443.0 | RAYNAUD'S SYNDROME |
| 443.1 | THROMBOANGIITIS OBLITERANS (BUERGER'S DISEASE) |
| 443.81 | PERIPHERAL ANGIOPATHY IN DISEASES CLASSIFIED ELSEWHERE |
| 443.89 | OTHER PERIPHERAL VASCULAR DISEASE |
| 443.9 | PERIPHERAL VASCULAR DISEASE UNSPECIFIED |
| 444.0 | EMBOLISM AND THROMBOSIS OF ABDOMINAL AORTA |
| 444.1 | EMBOLISM AND THROMBOSIS OF THORACIC AORTA |
| 444.21 | ARTERIAL EMBOLISM AND THROMBOSIS OF UPPER EXTREMITY |
| 444.22 | ARTERIAL EMBOLISM AND THROMBOSIS OF LOWER EXTREMITY |
| 444.81 | EMBOLISM AND THROMBOSIS OF ILIAC ARTERY |
| 444.89 | EMBOLISM AND THROMBOSIS OF OTHER ARTERY |
| 444.9 | EMBOLISM AND THROMBOSIS OF UNSPECIFIED ARTERY |
| 447.0 | ARTERIOVENOUS FISTULA ACQUIRED |
| 447.1 | STRICTURE OF ARTERY |
| 447.2 | RUPTURE OF ARTERY |
| 707.10 - 707.19 | UNSPECIFIED ULCER OF LOWER LIMB - ULCER OF OTHER PART OF LOWER LIMB |
| 707.8 | CHRONIC ULCER OF OTHER SPECIFIED SITES |

http://coverage.cms.fu.com/mcd_archive/viewlcd_pdf.asp?lcd_id=1352&lcd_version=42&...   6/17/2013

**Coding Information**

| | |
|---|---|
| 785.4 | GANGRENE |
| 903.00 | INJURY TO AXILLARY VESSEL(S) UNSPECIFIED |
| 903.01 | INJURY TO AXILLARY ARTERY |
| 903.02 | INJURY TO AXILLARY VEIN |
| 903.1 | INJURY TO BRACHIAL BLOOD VESSELS |
| 903.2 | INJURY TO RADIAL BLOOD VESSELS |
| 903.3 | INJURY TO ULNAR BLOOD VESSELS |
| 903.4 | INJURY TO PALMAR ARTERY |
| 903.5 | INJURY TO DIGITAL BLOOD VESSELS |
| 903.8 | INJURY TO OTHER SPECIFIED BLOOD VESSELS OF UPPER EXTREMITY |
| 903.9 | INJURY TO UNSPECIFIED BLOOD VESSEL OF UPPER EXTREMITY |
| 904.0 | INJURY TO COMMON FEMORAL ARTERY |
| 904.1 | INJURY TO SUPERFICIAL FEMORAL ARTERY |
| 904.2 | INJURY TO FEMORAL VEINS |
| 904.3 | INJURY TO SAPHENOUS VEINS |
| 904.40 | INJURY TO POPLITEAL VESSEL(S) UNSPECIFIED |
| 904.41 | INJURY TO POPLITEAL ARTERY |
| 904.42 | INJURY TO POPLITEAL VEIN |
| 904.50 | INJURY TO TIBIAL VESSEL(S) UNSPECIFIED |
| 904.51 | INJURY TO ANTERIOR TIBIAL ARTERY |
| 904.52 | INJURY TO ANTERIOR TIBIAL VEIN |
| 904.53 | INJURY TO POSTERIOR TIBIAL ARTERY |
| 904.54 | INJURY TO POSTERIOR TIBIAL VEIN |
| 904.6 | INJURY TO DEEP PLANTAR BLOOD VESSELS |
| 904.7 | INJURY TO OTHER SPECIFIED BLOOD VESSELS OF LOWER EXTREMITY |
| 904.8 | INJURY TO UNSPECIFIED BLOOD VESSEL OF LOWER EXTREMITY |
| 904.9 | INJURY TO BLOOD VESSELS OF UNSPECIFIED SITE |
| 996.1 | MECHANICAL COMPLICATION OF OTHER VASCULAR DEVICE IMPLANT AND GRAFT |

## Coding Information

| 996.70 - 996.99 | OTHER COMPLICATIONS DUE TO UNSPECIFIED DEVICE IMPLANT AND GRAFT - COMPLICATION OF OTHER SPECIFIED REATTACHED BODY PART |
|---|---|
| 997.2 | PERIPHERAL VASCULAR COMPLICATIONS NOT ELSEWHERE CLASSIFIED |
| 998.11 - 998.13 | HEMORRHAGE COMPLICATING A PROCEDURE - SEROMA COMPLICATING A PROCEDURE |
| 998.2 | ACCIDENTAL PUNCTURE OR LACERATION DURING A PROCEDURE NOT ELSEWHERE CLASSIFIED |
| V67.00 | FOLLOW-UP EXAMINATION FOLLOWING UNSPECIFIED SURGERY |

Extremity Venous Evaluation Indications

| 415.11 | IATROGENIC PULMONARY EMBOLISM AND INFARCTION |
|---|---|
| 415.19 | OTHER PULMONARY EMBOLISM AND INFARCTION |
| 451.0 - 451.9 | PHLEBITIS AND THROMBOPHLEBITIS OF SUPERFICIAL VESSELS OF LOWER EXTREMITIES - PHLEBITIS AND THROMBOPHLEBITIS OF UNSPECIFIED SITE |
| 454.0 | VARICOSE VEINS OF LOWER EXTREMITIES WITH ULCER |
| 454.1 | VARICOSE VEINS OF LOWER EXTREMITIES WITH INFLAMMATION |
| 454.2 | VARICOSE VEINS OF LOWER EXTREMITIES WITH ULCER AND INFLAMMATION |
| 459.10 - 459.19 | POSTPHLEBETIC SYNDROME WITHOUT COMPLICATIONS - POSTPHLEBETIC SYNDROME WITH OTHER COMPLICATION |
| 459.2 | COMPRESSION OF VEIN |
| 671.00 - 671.94 | VARICOSE VEINS OF LEGS COMPLICATING PREGNANCY AND THE PUERPERIUM UNSPECIFIED AS TO EPISODE OF CARE - UNSPECIFIED POSTPARTUM VENOUS COMPLICATION |
| 695.9 | UNSPECIFIED ERYTHEMATOUS CONDITION |
| 707.10 | UNSPECIFIED ULCER OF LOWER LIMB |
| 729.5 | PAIN IN LIMB |
| 729.81 | SWELLING OF LIMB |
| 747.60 | ANOMALY OF THE PERIPHERAL VASCULAR SYSTEM UNSPECIFIED SITE |
| 747.61 | GASTROINTESTINAL VESSEL ANOMALY |
| 747.62 | RENAL VESSEL ANOMALY |

**Coding Information**

| | |
|---|---|
| 747.63 | UPPER LIMB VESSEL ANOMALY |
| 747.64 | LOWER LIMB VESSEL ANOMALY |
| 747.69 | ANOMALIES OF OTHER SPECIFIED SITES OF PERIPHERAL VASCULAR SYSTEM |
| 782.2 | LOCALIZED SUPERFICIAL SWELLING MASS OR LUMP |
| 782.3 | EDEMA |
| 785.4 | GANGRENE |
| 786.00 | RESPIRATORY ABNORMALITY UNSPECIFIED |
| 786.09 | RESPIRATORY ABNORMALITY OTHER |
| 786.3 | HEMOPTYSIS |
| 786.52 | PAINFUL RESPIRATION |
| 786.59 | OTHER CHEST PAIN |
| 794.2 | NONSPECIFIC ABNORMAL RESULTS OF FUNCTION STUDY OF PULMONARY SYSTEM |
| 903.00 - 903.9 | INJURY TO AXILLARY VESSEL(S) UNSPECIFIED - INJURY TO UNSPECIFIED BLOOD VESSEL OF UPPER EXTREMITY |
| 904.0 - 904.9 | INJURY TO COMMON FEMORAL ARTERY - INJURY TO BLOOD VESSELS OF UNSPECIFIED SITE |
| 996.1 | MECHANICAL COMPLICATION OF OTHER VASCULAR DEVICE IMPLANT AND GRAFT |
| 996.70 | OTHER COMPLICATIONS DUE TO UNSPECIFIED DEVICE IMPLANT AND GRAFT |
| 996.71 | OTHER COMPLICATIONS DUE TO HEART VALVE PROSTHESIS |
| 996.72 | OTHER COMPLICATIONS DUE TO OTHER CARDIAC DEVICE IMPLANT AND GRAFT |
| 996.73 | OTHER COMPLICATIONS DUE TO RENAL DIALYSIS DEVICE IMPLANT AND GRAFT |
| 996.74 | OTHER COMPLICATIONS DUE TO OTHER VASCULAR DEVICE IMPLANT AND GRAFT |
| 996.75 | OTHER COMPLICATIONS DUE TO NERVOUS SYSTEM DEVICE IMPLANT AND GRAFT |
| 996.76 | OTHER COMPLICATIONS DUE TO GENITOURINARY DEVICE IMPLANT AND GRAFT |
| 996.77 | OTHER COMPLICATIONS DUE TO INTERNAL JOINT PROSTHESIS |
| 996.78 | |

## Coding Information

|  | OTHER COMPLICATIONS DUE TO OTHER INTERNAL ORTHOPEDIC DEVICE IMPLANT AND GRAFT |
|---|---|
| 996.79 | OTHER COMPLICATIONS DUE TO OTHER INTERNAL PROSTHETIC DEVICE IMPLANT AND GRAFT |
| 997.2 | PERIPHERAL VASCULAR COMPLICATIONS NOT ELSEWHERE CLASSIFIED |
| 998.2 | ACCIDENTAL PUNCTURE OR LACERATION DURING A PROCEDURE NOT ELSEWHERE CLASSIFIED |
| 999.2 | OTHER VASCULAR COMPLICATIONS OF MEDICAL CARE NOT ELSEWHERE CLASSIFIED |
| V12.51 | PERSONAL HISTORY OF VENOUS THROMBOSIS AND EMBOLISM |
| V12.52 | PERSONAL HISTORY OF THROMBOPHLEBITIS |
| V67.00 | FOLLOW-UP EXAMINATION FOLLOWING UNSPECIFIED SURGERY |
| V72.83* | OTHER SPECIFIED PRE-OPERATIVE EXAMINATION |

V72.83 is only applicable to 93970 and 93971 when coded with 585.6 or 585.9 Chronic Renal Failure, as the secondary diagnosis. In 2006 must be coded to the fourth position

Visceral and Penile Vascular Studies

| 401.0 | MALIGNANT ESSENTIAL HYPERTENSION |
|---|---|
| 401.1 | BENIGN ESSENTIAL HYPERTENSION |
| 401.9 | UNSPECIFIED ESSENTIAL HYPERTENSION |
| 402.00 | MALIGNANT HYPERTENSIVE HEART DISEASE WITHOUT HEART FAILURE |
| 402.01 | MALIGNANT HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 402.10 | BENIGN HYPERTENSIVE HEART DISEASE WITHOUT HEART FAILURE |
| 402.11 | BENIGN HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 402.90 | UNSPECIFIED HYPERTENSIVE HEART DISEASE WITHOUT HEART FAILURE |
| 402.91 | UNSPECIFIED HYPERTENSIVE HEART DISEASE WITH HEART FAILURE |
| 403.00 - 403.01 | HYPERTENSIVE CHRONIC KIDNEY DISEASE, MALIGNANT, WITH CHRONIC KIDNEY DISEASE STAGE I THROUGH STAGE IV, OR UNSPECIFIED - HYPERTENSIVE CHRONIC KIDNEY DISEASE, |

**Coding Information**

|  | MALIGNANT, WITH CHRONIC KIDNEY DISEASE STAGE V OR END STAGE RENAL DISEASE |
|---|---|
| 403.10 - 403.11 | HYPERTENSIVE CHRONIC KIDNEY DISEASE, BENIGN, WITH CHRONIC KIDNEY DISEASE STAGE I THROUGH STAGE IV, OR UNSPECIFIED - HYPERTENSIVE CHRONIC KIDNEY DISEASE, BENIGN, WITH CHRONIC KIDNEY DISEASE STAGE V OR END STAGE RENAL DISEASE |
| 403.90 - 403.91 | HYPERTENSIVE CHRONIC KIDNEY DISEASE, UNSPECIFIED, WITH CHRONIC KIDNEY DISEASE STAGE I THROUGH STAGE IV, OR UNSPECIFIED - HYPERTENSIVE CHRONIC KIDNEY DISEASE, UNSPECIFIED, WITH CHRONIC KIDNEY DISEASE STAGE V OR END STAGE RENAL DISEASE |
| 404.00 - 404.93 | HYPERTENSIVE HEART AND CHRONIC KIDNEY DISEASE, MALIGNANT, WITHOUT HEART FAILURE AND WITH CHRONIC KIDNEY DISEASE STAGE I THROUGH STAGE IV, OR UNSPECIFIED - HYPERTENSIVE HEART AND CHRONIC KIDNEY DISEASE, UNSPECIFIED, WITH HEART FAILURE AND CHRONIC KIDNEY DISEASE STAGE V OR END STAGE RENAL DISEASE |
| 405.01 | MALIGNANT RENOVASCULAR HYPERTENSION |
| 405.09 | OTHER MALIGNANT SECONDARY HYPERTENSION |
| 405.11 | BENIGN RENOVASCULAR HYPERTENSION |
| 405.19 | OTHER BENIGN SECONDARY HYPERTENSION |
| 405.91 | UNSPECIFIED RENOVASCULAR HYPERTENSION |
| 405.99 | OTHER UNSPECIFIED SECONDARY HYPERTENSION |
| 440.0 | ATHEROSCLEROSIS OF AORTA |
| 440.1 | ATHEROSCLEROSIS OF RENAL ARTERY |
| 440.20 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES UNSPECIFIED |
| 440.21 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH INTERMITTENT CLAUDICATION |
| 440.22 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH REST PAIN |
| 440.23 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH ULCERATION |
| 440.24 | ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES WITH GANGRENE |
| 440.29 | OTHER ATHEROSCLEROSIS OF NATIVE ARTERIES OF THE EXTREMITIES |

**Coding Information**

| | |
|---|---|
| 440.30 | ATHEROSCLEROSIS OF UNSPECIFIED BYPASS GRAFT OF THE EXTREMITIES |
| 440.31 | ATHEROSCLEROSIS OF AUTOLOGOUS VEIN BYPASS GRAFT OF THE EXTREMITIES |
| 440.32 | ATHEROSCLEROSIS OF NONAUTOLOGOUS BIOLOGICAL BYPASS GRAFT OF THE EXTREMITIES |
| 440.8 | ATHEROSCLEROSIS OF OTHER SPECIFIED ARTERIES |
| 440.9 | GENERALIZED AND UNSPECIFIED ATHEROSCLEROSIS |
| 441.00 - 441.9 | DISSECTION OF AORTA ANEURYSM UNSPECIFIED SITE - AORTIC ANEURYSM OF UNSPECIFIED SITE WITHOUT RUPTURE |
| 442.0 - 442.9 | ANEURYSM OF ARTERY OF UPPER EXTREMITY - OTHER ANEURYSM OF UNSPECIFIED SITE |
| 443.0 | RAYNAUD'S SYNDROME |
| 443.1 | THROMBOANGIITIS OBLITERANS (BUERGER'S DISEASE) |
| 443.81 | PERIPHERAL ANGIOPATHY IN DISEASES CLASSIFIED ELSEWHERE |
| 443.89 | OTHER PERIPHERAL VASCULAR DISEASE |
| 443.9 | PERIPHERAL VASCULAR DISEASE UNSPECIFIED |
| 444.0 | EMBOLISM AND THROMBOSIS OF ABDOMINAL AORTA |
| 444.1 | EMBOLISM AND THROMBOSIS OF THORACIC AORTA |
| 444.21 | ARTERIAL EMBOLISM AND THROMBOSIS OF UPPER EXTREMITY |
| 444.22 | ARTERIAL EMBOLISM AND THROMBOSIS OF LOWER EXTREMITY |
| 444.81 | EMBOLISM AND THROMBOSIS OF ILIAC ARTERY |
| 444.89 | EMBOLISM AND THROMBOSIS OF OTHER ARTERY |
| 444.9 | EMBOLISM AND THROMBOSIS OF UNSPECIFIED ARTERY |
| 447.0 | ARTERIOVENOUS FISTULA ACQUIRED |
| 447.1 | STRICTURE OF ARTERY |
| 447.2 | RUPTURE OF ARTERY |
| 447.3 | HYPERPLASIA OF RENAL ARTERY |
| 447.4 | CELIAC ARTERY COMPRESSION SYNDROME |
| 447.5 | NECROSIS OF ARTERY |
| 447.6 | ARTERITIS UNSPECIFIED |

**Coding Information**

447.8          OTHER SPECIFIED DISORDERS OF ARTERIES AND ARTERIOLES

447.9          UNSPECIFIED DISORDERS OF ARTERIES AND ARTERIOLES

557.0          ACUTE VASCULAR INSUFFICIENCY OF INTESTINE

607.82         VASCULAR DISORDERS OF PENIS

607.84         IMPOTENCE OF ORGANIC ORIGIN

607.89         OTHER SPECIFIED DISORDERS OF PENIS

Extremity Arterial-Venous Studies

996.73         OTHER COMPLICATIONS DUE TO RENAL DIALYSIS DEVICE
               IMPLANT AND GRAFT

**Diagnoses that Support Medical Necessity**

**ICD-9 Codes that DO NOT Support Medical Necessity**

**ICD-9 Codes that DO NOT Support Medical Necessity Asterisk Explanation**

**Diagnoses that DO NOT Support Medical Necessity**

**General Information**



**Documentation Requirements**

If documentation is requested to support medical necessity, submit:

- History and Physical

## General Information

- M.D. orders/progress notes

- Diagnosis/ Reason for testing

- Test results

- Itemization of charges

## Appendices

## Utilization Guidelines

## Sources of Information and Basis for Decision

Carrier Policy

## Advisory Committee Meeting Notes

This policy does not reflect the sole opinion of the contractor or contractor medical director. Although the final decision rests with the contractor, this policy was developed in cooperation with advisory groups, which includes representatives from appropriate specialties as well as provider (facility) representatives.

## Start Date of Comment Period

## End Date of Comment Period

## Start Date of Notice Period

11/27/1996

## Revision History Number

1352b

## General Information

**Revision History Explanation**

01/06/2006 Added to Group 4 V72.83 is only applicable to 93970 and 93971 when coded with 585.6 or 585.9 Chronic Renal Failure, as the secondary diagnosis. In 2006 must be coded to the fourth position

07/24/2003 ICD-9 Code 459.1 under CPT code 93971, updated to meet 5th digit requirement for 2003 [459.10, 459.11, 459.12, 459.13, 459.19].

07/10/2003 ICD-9 code V72.83 was added to the list of ICD-9 Codes that Support Medical Necessity for CPT codes 93970 and 93971

01/10/2003 Added 12x to Type of Bill Code

07/24/2002 Formatted

11/13/2000 checked ICD-9 Codes & CPT Codes by 2001 Code Books

09/04/2004 - This policy was updated by the ICD-9 Code Annual Update for 2004-2005.

09/04/2005 - This policy was updated by the ICD-9 2005-2006 Annual Update.

This LCD was converted from an LMRP on 12/6/2005

7/2/2006 - The description for Bill code 14 was changed

09/04/2006 - This policy was updated by the ICD-9 2006-2007 Annual Update.

11/18/2006 - The description for CPT/HCPCS code 93875 was changed in group 2
11/18/2006 - The description for CPT/HCPCS code 93922 was changed in group 3
11/18/2006 - The description for CPT/HCPCS code 93923 was changed in group 3
11/18/2006 - The description for CPT/HCPCS code 93924 was changed in group 3
11/18/2006 - The description for CPT/HCPCS code 93965 was changed in group 4

10/05/2007 - Frequently Asked Questions restored to Appendices.

2/18/2008 - The description for Bill code 21 was changed

3/20/2008 - Frequently Asked Questions removed from Appendices

08/10/2008 - This policy was updated by the ICD-9 2008-2009 Annual Update.

08/26/2008 – The state of New Jersey removed from the Primary Geographic Jurisdiction as required by the MAC-PartA/PartB contractor workload number 12401

07/02/2009 – Annual review with no changes

08/02/2009 - In accordance with Section 911 of the Medicare Modernization Act of 2003, this

**General Information**

policy was retired due to the transition from FI Riverbend GBA (00390) to MAC - Part A Cahaba GBA (10301)

**Reason for Change**

Maintenance (annual review with new changes, formatting, etc.)

**Last Reviewed On Date**

07/02/2009

**Related Documents**

**Article(s)**

A37868 - Noninvasive Vascular Studies

**LCD Attachments**

FAQ (a comment and response document) (1,674 bytes)

**All Versions**



Updated on 08/02/2009 with effective dates 09/01/2008 - 08/02/2009

Updated on 08/26/2008 with effective dates 09/01/2008 - N/A

Updated on 03/20/2008 with effective dates 12/07/2005 - 08/31/2008

Updated on 02/18/2008 with effective dates 12/07/2005 - N/A

Updated on 10/05/2007 with effective dates 12/07/2005 - N/A

Updated on 11/18/2006 with effective dates 12/07/2005 - N/A

Updated on 09/22/2006 with effective dates 12/07/2005 - N/A

Updated on 09/04/2006 with effective dates 12/07/2005 - N/A

Updated on 09/01/2006 with effective dates 12/07/2005 - N/A

Updated on 07/02/2006 with effective dates 12/07/2005 - N/A

Updated on 02/08/2006 with effective dates 12/07/2005 - N/A

Updated on 02/08/2006 with effective dates 12/07/2005 - N/A

Updated on 01/10/2006 with effective dates 12/07/2005 - N/A

**All Versions**

Updated on 12/06/2005 with effective dates 12/07/2005 - N/A

Updated on 12/06/2005 with effective dates 12/07/2005 - N/A

Updated on 12/06/2005 with effective dates 07/24/2003 - 12/06/2005

Updated on 10/10/2003 with effective dates 07/24/2003 - N/A

Updated on 10/08/2003 with effective dates 07/24/2003 - N/A

Updated on 07/23/2003 with effective dates 07/24/2003 - N/A

Updated on 07/10/2003 with effective dates 07/10/2003 - 07/23/2003

Updated on 03/11/2003 with effective dates 01/10/2003 - 07/09/2003

Updated on 02/15/2003 with effective dates 01/10/2003 - N/A

Updated on 01/09/2003 with effective dates 01/10/2003 - N/A

Updated on 12/18/2002 with effective dates 07/24/2002 - 01/09/2003

Updated on 10/21/2002 with effective dates 07/24/2002 - N/A

Updated on 10/04/2002 with effective dates 07/24/2002 - N/A

# Exhibit H

Health Care Facilities

# Licensed Facilities

For more information, please contact:
Health Care Facilities: (615)741-7221 or 1-888-310-4650

## Current Listings:

*Type* = Hospital   *County* = DAVIDSON   *Name* = Baptist Hospital

Click here to return to the search page

**Total Facilties:1**                                                   **Total Beds:683**

1.
BAPTIST HOSPITAL
2000 CHURCH STREET
NASHVILLE , TN 37236
*Attn:* BERNARD J. SHERRY,
CEO
(615) 284-6851

Administrator: BERNARD J.
SHERRY, CEO
*Owner Information:*
SETON CORPORATION
2000 CHURCH ST.
NASHVILLE, TN 37236
(615) 284-5555

*Facility License
Number:* 00000032
*Status:* Licensed
*Number of Beds:* 0683
*Date of Last
Survey:* 05/06/2009
*Accreditation
Expires:* 04/08/2014
*Date of Original
Licensure:* 07/01/1992
*Date of Expiration:* 04/30/2014

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 81 of 97 PageID #: 280

# Exhibit I

# CERTIFICATE OF ST. THOMAS BAPTIST HEALTH CORPORATION (F/K/A MIDDLE TENNESSEE HEALTH CORPORATION) CONCERNING ITS AMENDED AND RESTATED CHARTER

Corporate Control No. 0171705

FILED

01 DEC 31 PM 3: 15

Pursuant to the provisions of Section 48-60-106(h) of the Tennessee Nonprofit Corporation Act, as amended, St. Thomas Baptist Health Corporation (formerly known as Middle Tennessee Health Corporation) (the "Corporation") certifies as follows:

I. The name of the Corporation as it appears of record is Middle Tennessee Health Corporation. The new name of the Corporation is St. Thomas Baptist Health Corporation.

II. The Amended and Restated Charter to which this Certificate is attached amends Sections 1 through 7 of the Corporation's Charter by substituting therefor Sections 1 through 11 of the Amended and Restated Charter.

III. The Amended and Restated Charter was duly adopted by the Board of Directors of the Corporation acting in their joint capacity as directors and members of the Corporation at a meeting held on December 6, 2001.

IV. The Corporation is not for profit.

V. Approval of the amendments to the Charter by some person or persons other than the Board of Directors acting in their joint capacity as directors and members of the Corporation, or the incorporator is not required pursuant to Section 48-60-301 of the Tennessee Nonprofit Corporation Act, as amended.

VI. The Amended and Restated Charter shall be effective on the date of filing.

DATED as of the 31st day of December, 2001.

ST. THOMAS BAPTIST HEALTH
CORPORATION (F/K/A MIDDLE
TENNESSEE HEALTH CORPORATION)

By: _Kenneth J. Venuto_____

Kenneth J. Venuto
Assistant Secretary

768084 v1
084000-404  12/27/2001

- 1 -

# AMENDED AND RESTATED
# CHARTER OF
# ST. THOMAS BAPTIST HEALTH CORPORATION
# (FORMERLY KNOWN AS MIDDLE TENNESSEE HEALTH CORPORATION)

Pursuant to the provisions of Section 48-60-106 of the Tennessee Nonprofit Corporation Act, as amended (the "Act"), the undersigned adopts the following as the Amended and Restated Charter of St. Thomas Baptist Health Corporation, a Tennessee nonprofit corporation (the "Corporation"):

## ARTICLE I
## NAME

1.1     The name of the Corporation is St. Thomas Baptist Health Corporation.

## ARTICLE II
## TYPE

2.1     The Corporation is a public benefit corporation.

2.2     The Corporation is not for profit.

## ARTICLE III
## PURPOSE

3.1     The Corporation is organized exclusively for charitable, religious, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or the corresponding provision of any future United States Internal Revenue Law) (the "Code"), including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Code. Further, the Corporation is organized and at all times shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Sponsors of Ascension Health, a Missouri nonprofit corporation (the term "Sponsors" as used herein shall have the meaning ascribed to it within the Ascension Health system), and such other Subsidiary Organizations (as that term is generally understood within the Ascension Health system) that qualify under Section 501(c)(3) and under Section 509(a)(1) or Section 509(a)(2) of the Code. The Corporation's purposes shall be consistent with and supportive of the corporate purposes of Ascension Health, and the Corporation's purposes shall include the following:

3.1.1     Serve as the parent corporation for an integrated health care delivery and financing network.

3.1.2     Serve as an integral part of the Roman Catholic Church and carry out its mission in support of or in furtherance of the charitable purposes of or the organizations described in this Article.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 84 of 97 PageID #: 283

3.1.3      Further the philosophy and mission of Ascension Health of healing and service for the sick and poor, and promote, support and engage in any of the religious, charitable, scientific and educational ministries which are now, or may hereafter be established by Ascension Health, or co-sponsored by the Sponsors and which are in furtherance of or in support of the charitable purposes of the organizations described in this Article.

3.1.4      Raise funds for any or all of the organizations described in this Article from the public and from all other sources available; receive and maintain such funds and expend principal and income therefrom in support of or in furtherance of the charitable purposes of such organizations.

3.1.5      Acquire, own, use, lease as lessor or lessee, convey and otherwise deal in and with real and personal property and any interest therein, all in support of or in furtherance of the charitable purposes of organizations described in this Article.

3.1.6      Contract with other organizations (for profit and nonprofit), with individuals and with governmental agencies in support of or in furtherance of the charitable purposes of the organizations described in this Article.

3.1.7      Engage in any lawful activities within the purposes for which a corporation may be organized under the Tennessee Nonprofit Corporation Act (the "Act"), as it may be amended from time to time, which are in furtherance of or in support of the charitable purposes of the organizations described in this Article.

3.1.8      Serve as the controlling entity of Subsidiary Organizations that conduct health related and other activities, and limit the powers, duties and responsibilities of the governing bodies of such Subsidiary Organizations, all in accordance with requirements as established by Ascension Health.

3.1.9      Support institutions co-sponsored by the Sponsors, both within and without the State, and cooperate with other Ascension Health institutions.

3.1.10      Promote cooperation and exchange of knowledge and experience among the various apostolates of the Sponsors within the health care mission.

3.1.11      Otherwise operate in support of or in furtherance of the charitable purposes of the organizations described in this Article, and do so exclusively for religious, charitable, scientific or educational purposes within the meaning of Section 501(c)(3) of the Code and in the course of such operation:

    (a)      No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons unless allowed by Section 501(c)(3) of the Code and the Act except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein.

Case 3:12-cv-00501    Document 34-1    Filed 06/18/13    Page 85 of 97 PageID #: 284

(b)    No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

(c)    Notwithstanding any other provisions of the Corporation's Governing Documents, the Corporation shall not carry on any other activities not permitted to be carried on: (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Code, or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Code.

## ARTICLE IV
## PERIOD OF EXISTENCE

4.1    The period during which the Corporation shall continue is perpetual.

## ARTICLE V
## MEMBERSHIP

5.1    <u>Members</u>. The Corporation shall have members.

5.2    <u>Identity of Member</u>. There shall be one (1) member of the Corporation who shall be known as the "Corporate Member," and such Corporate Member shall be Ascension Health, a Missouri nonprofit corporation.

5.3    <u>Transferability of Membership Interest</u>. The Corporate Member's interest as a member in the Corporation may be transferred by the Corporate Member.

## ARTICLE VI
## REGISTERED OFFICE, AGENT AND PRINCIPAL OFFICE

6.1    <u>Registered Office and Agent</u>. The street address, zip code and county of the registered office of the Corporation is 4220 Harding Road, Nashville, Davidson County, Tennessee 37205, and the name of the Corporation's registered agent at such address is Sister Priscilla Grimes, D.C.,

6.2    <u>Principal Office</u>. The street address and zip code of the principal office of the Corporation is 4220 Harding Road, Nashville, Davidson County, Tennessee 37205.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 86 of 97 PageID #: 285

## ARTICLE VII
## BOARD OF TRUSTEES; RESERVED POWERS

7.1     Powers and Responsibilities.    The business, property, and affairs of the Corporation shall be managed and controlled by the Corporation's Board of Trustees ("Board of Trustees" or "Board") in accordance with the policies established by the Corporate Member or any successor entity. The Board of Trustees shall act as the board of directors of the Corporation as required by the Act.

7.2     Powers Reserved to Corporate Member. The following powers are reserved to the Corporate Member:

  7.2.1     Approve the formation or acquisition of legal entities for which the Corporate Member will serve as the sole or controlling entity and, subject to canonical requirements, approve the sale, transfer or substantial change in use of all or substantially all of the assets of the Corporation or the divestiture, dissolution, closure, merger, consolidation, change in corporate membership or corporate reorganization of the Corporation.

  7.2.2     Approve requirements of, and approve changes to, the Governing Documents (as that term is generally understood within the Ascension Health system) of the Corporation and its Subsidiary Organizations, if the changes are consistent with the System Requirements (as that term is generally understood within the Ascension Health system) for governing documents.

  7.2.3     Approve requirements of, and approve changes to, the Governing Documents of the Corporation and its Subsidiary Organizations, if the changes are inconsistent with the System Requirements for governing documents, provided that the Corporate Member in approving such changes acts through its Board.

  7.2.4     Appoint, upon the recommendation of the Board of the Corporation, or remove, with or without cause, the members of the Board of Trustees of the Corporation.

  7.2.5     Appoint or remove, with or without cause, the Chair of the Board of the Corporation, in consultation with the member with canonical jurisdiction.

  7.2.6     Approve the transfer of assets and the reallocation of debt among Health Ministries in accordance with the System Authority Matrix, in consultation with the Corporation's Board.

  7.2.7     Approve the transfer or encumbrance of tax exempt financed assets of the Corporation and its Subsidiary Organizations in accordance with the System Authority Matrix.

  7.2.8     Approve the incurrence of debt of the Corporation in accordance with the System Authority Matrix.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 87 of 97 PageID #: 286

## ARTICLE VIII
## DISSOLUTION

8.1        Upon the dissolution of the Corporation, the disposition of all the assets of the Corporation shall be in a manner as provided by the Board of Trustees (subject to the prior approval of Corporate Member) and in accordance with the following:

    8.1.1        The paying of or the making of provision of the payment of all of the liabilities, direct or indirect, contingent or otherwise, including without limitation, all liabilities evidenced in all outstanding loan agreements, credit agreements, master indentures and other similar documents.

    8.1.2        Subject to compliance with the dissolution principles of the Corporate Member, all assets remaining after the payment of all of the liabilities of the Corporation shall be distributed, exclusively in furtherance of the religious, charitable, scientific, literary and educational purposes of the Corporation within the meaning of Section 501(c)(3) of the Code, to the Corporate Member or such other exempt organization(s) under Section 501(c)(3) of the Code as shall be determined by the Members of the Corporate Member.

8.2        Any other assets not so disposed of shall be distributed for one or more exempt purposes within the meaning of Section 501(c)(3) of the Code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

The date on which the original Charter was filed with the Tennessee Secretary of State was April 28, 1986.

This Amended and Restated Charter shall be effective on December 31, 2001.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 88 of 97 PageID #: 287

# Exhibit J

# CERTIFICATE OF SETON CORPORATION
# CONCERNING ITS AMENDED AND RESTATED CHARTER

Corporate Control No. 0414306

Pursuant to the provisions of Section 48-60-106(h) of the Tennessee Nonprofit Corporation Act, as amended, Seton Corporation (the "Corporation") certifies as follows:

I.      The name of the Corporation as it appears of record is Seton Corporation.

II.     The Amended and Restated Charter to which this Certificate is attached amends Articles I through VIII of the Corporation's Charter by substituting therefor Articles I through VIII of the Amended and Restated Charter.

III.    The Amended and Restated Charter was duly adopted by unanimous written consent of the Board of Trustees of the Corporation dated as of December 31, 2001 and approved by action of the Chief Executive Officer of Saint Thomas Health Services, a Tennessee nonprofit corporation and the sole member of the Corporation ("STHS").

IV.     The Corporation is not for profit.

V.      Approval of the amendments to the Charter by some person or persons other than the Board of Trustees and the Chief Executive Officer of STHS is not required pursuant to Section 48-60-301 of the Tennessee Nonprofit Corporation Act, as amended.

VI.     The Amended and Restated Charter shall be effective on the date of filing.

DATED as of the 31st day of December, 2001.

SETON CORPORATION

By: *Thomas E. Beeman*
Thomas E. Beeman
Chairman, Board of Trustees

767797 v1
084000-404  12/19/2001

- 1 -

# AMENDED AND RESTATED
# CHARTER OF
# SETON CORPORATION

Pursuant to the provisions of Section 48-60-106 of the Tennessee Nonprofit Corporation Act, as amended (the "Act"), Seton Corporation, a Tennessee nonprofit corporation (the "Corporation") adopts the following Amended and Restated Charter:

## ARTICLE I
## NAME

1.1     The name of the Corporation is Seton Corporation.

## ARTICLE II
## TYPE

2.1     The Corporation is a public benefit corporation.

2.2     The Corporation is not for profit.

## ARTICLE III
## PURPOSE

3.1     The Corporation is organized exclusively for charitable, religious, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or the corresponding provision of any future United States Internal Revenue Law) (the "Code"), including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under Section 501(c)(3) of the Code.  The Corporation's purposes shall be consistent with and supportive of the corporate purposes of Ascension Health, a Missouri nonprofit corporation, and the Corporation's purposes shall include the following:

3.1.1     Serve as an integral part of the Roman Catholic Church and carry out its mission in support of or in furtherance of the charitable purposes of the organizations described in this Article.

3.1.2     Further the philosophy and mission of Ascension Health of healing and service for the sick and poor, and promote, support and engage in any of the religious, charitable, scientific and educational ministries which are now, or may hereafter be established by Ascension Health, or co-sponsored by the Sponsors (as that term is generally understood within the Ascension Health system) and which are in furtherance of or in support of the charitable purposes of the organizations described in this Article.

3.1.3     Raise funds for any or all of the organizations described in this Article from the public and from all other sources available; receive and maintain such

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 91 of 97 PageID #: 290

funds and expend principal and income therefrom in support of or in furtherance of the charitable purposes of such organizations.

3.1.4    Acquire, own, use, lease as lessor or lessee, convey and otherwise deal in and with real and personal property and any interest therein, all in support of or in furtherance of the charitable purposes of organizations described in this Article.

3.1.5    Contract with other organizations (for profit and nonprofit), with individuals and with governmental agencies in support of or in furtherance of the charitable purposes of the organizations described in this Article.

3.1.6    Establish, develop, sponsor, promote and/or conduct educational programs, religious programs, scientific research, treatment facilities, rehabilitation centers, housing centers, management services, human service programs and other charitable activities, all in promotion and support of the interests and purposes of the organizations described in this Article.

3.1.7    Own or operate facilities or own other assets for public use and welfare in furtherance of the charitable purposes of the organizations described in this Article.

3.1.8    Engage in any lawful activities within the purposes for which a corporation may be organized under the Tennessee Nonprofit Corporation Act (the "Act"), as it may be amended from time to time, which are in furtherance of or in support of the charitable purposes of the organizations described in this Article.

3.1.9    Serve as the controlling entity of Subsidiary Organizations (as that term is generally understood within the Ascension Health system) that conduct health related and other activities, and limit the powers, duties and responsibilities of the governing bodies of such Subsidiary Organizations, all in accordance with requirements as established by the Corporate Member (as defined in Article V).

3.1.10   Support institutions co-sponsored by the Sponsors, both within and without Tennessee, and cooperate with other Ascension Health institutions.

3.1.11   Promote cooperation and exchange of knowledge and experience among the various apostolates of the Sponsors within the health care mission.

3.1.12   Otherwise operate in support of or in furtherance of the charitable purposes of the organizations described in this Article, and do so exclusively for religious, charitable, scientific or educational purposes within the meaning of Section 501(c)(3) of the Code and in the course of such operation:

(a)    No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers, or other private persons unless allowed by Section 501(c)(3) of the Code and the Act except that the Corporation shall be authorized and empowered to pay

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 92 of 97 PageID #: 291

reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth herein.

(b)     No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

(c)     Notwithstanding any other provisions of the Corporation's governing documents, the Corporation shall not carry on any other activities not permitted to be carried on: (a) by a corporation exempt from federal income tax under Section 501(c)(3) of the Code, or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Code.

3.1.13     Operate a hospital and other health care providers and services in furtherance of the charitable purposes described above.

## ARTICLE IV
## PERIOD OF EXISTENCE

4.1     The period during which the Corporation shall continue is perpetual.

## ARTICLE V
## MEMBERSHIP

5.1     <u>Members</u>. The Corporation shall have members.

5.2     <u>Identity of Member</u>. There shall be one (1) member of the Corporation who shall be known as the "Corporate Member," and such Corporate Member shall be St. Thomas Baptist Health Corporation, a Tennessee nonprofit corporation.

5.3     <u>Transferability of Membership Interest</u>. The Corporate Member's interest as a member in the Corporation may be transferred by the Corporate Member.

## ARTICLE VI
## REGISTERED OFFICE, AGENT, PRINCIPAL OFFICE, AND INCORPORATOR

6.1     <u>Registered Office and Agent</u>. The street address, zip code and county of the registered office of the Corporation is 4220 Harding Road, Nashville, Davidson County, Tennessee 37205, and the name of the Corporation's registered agent at such address is Sister Priscilla Grimes, D.C.

6.2     <u>Principal Office</u>. The address of the principal office of the Corporation is 2000 Church Street, Nashville, Davidson County, Tennessee 37236.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 93 of 97 PageID #: 292

6.3     Incorporator.  The name and address of the Corporation's incorporator is J. B. Hardcastle, Jr., 414 Union Street, Suite 1600, Nashville, Davidson County, Tennessee  37219.

## ARTICLE VII
## BOARD OF TRUSTEES; RESERVED POWERS

7.1     Powers and Responsibilities.     The business, property, and affairs of the Corporation shall be managed and controlled by the Corporation's Board of Trustees ("Board of Trustees" or "Board") in accordance with the policies established by the Corporate Member or any successor entity.  The Board of Trustees shall act as the board of directors of the Corporation as required by the Act.

7.2     Powers Reserved to Corporate Member.  All action of the Corporation shall be by its Board of Trustees, subject to the following matters which require the approval of the Corporate Member:

7.2.1          Approve the mission and vision statements for the Corporation and assure compliance with the philosophy, mission, vision, Sponsor expectations and core values of the System.

7.2.2          Approve changes to the Governing Documents (as that term is generally understood within the Ascension Health system) of the Corporation and its non-controlled subsidiaries that are consistent with the System's Requirements for Governing Documents (as that term is generally understood within the Ascension Health system).

7.2.3          Approve changes to the Governing Documents of the Corporation and its non-controlled subsidiaries that are inconsistent with the System's Requirements for Governing Documents, provided that Ascension Health also approves such changes.

7.2.4          Appoint, upon the recommendation of the Board of the Corporation, or remove, with or without cause, the members of the Board of Trustees of the Corporation.  Removal does not require a recommendation of the Corporation's Board.

7.2.5          Approve the incurrence of debt of the Corporation in accordance with the System Authority Matrix (as that term is generally understood within the Ascension Health system).

7.2.6          Subject to canonical requirements, approve and recommend the formation of legal entities, the sale, transfer or substantial change in use of all or substantially all of the assets, divestitures, dissolutions, closures, mergers, consolidations, or changes in corporate membership of the Corporation in accordance with the System Authority Matrix.

Case 3:12-cv-00501   Document 34-1   Filed 06/18/13   Page 94 of 97 PageID #: 293

7.2.7      Approve the transfer or encumbrance of the assets of the Corporation in accordance with the System Authority Matrix.

7.2.8      Approve the operating budget and capital plan for the Corporation.

7.2.9      Deviate from the polices and restrictions imposed on the Corporation by the Corporate Member.

# ARTICLE VIII
## DISSOLUTION

8.1      Upon the dissolution of the Corporation, the disposition of all the assets of the Corporation shall be in a manner as provided by the Board of Trustees (subject to the prior approval of the Corporate Member) and in accordance with the following:

8.1.1      The paying of or the making of provision of the payment of all of the liabilities, direct or indirect, contingent or otherwise, including without limitation, all liabilities evidenced in all outstanding loan agreements, credit agreements, master indentures and other similar documents.

8.1.2      Subject to compliance with the dissolution principles of the Corporate Member, all assets remaining after the payment of all of the liabilities of the Corporation shall be distributed, exclusively in furtherance of the religious, charitable, scientific, literary and educational purposes of the Corporation within the meaning of Section 501(c)(3) of the Code, to St. Thomas Baptist Health Corporation or such other exempt organization(s) under Section 501(c)(3) of the Code that is a Subsidiary Organization of St. Thomas Baptist Health Corporation, or to such other exempt organization(s) under Section 501(c)(3) of the Code as shall be determined by the Members of Ascension Health.

8.1.3      Any other assets not so disposed of shall be distributed for one or more exempt purposes within the meaning of Section 501(c)(3) of the Code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

This Amended and Restated Charter shall be effective on December 31, 2001.

Case 3:12-cv-00501  Document 34-1  Filed 06/18/13  Page 95 of 97 PageID #: 294

# Exhibit K

# APPLICATION FOR

## ASSUMED CORPORATE NAME



Pursuant to the provisions of Section 48-54-101(d) of the Tennessee Nonprofit Corporation Act, as amended, the undersigned corporation hereby applies for use of an assumed corporate name:

      1.     The true name of the corporation is Seton Corporation. The control number of the corporation assigned by the Secretary of State is 0414306.

      2.     The state or country of incorporation is Tennessee.

      3.     The corporation intends to transact business under an assumed corporate name.

      4.     The assumed corporate name the corporation proposes to use in Tennessee is Baptist Hospital.

      It is understood that the right to use the assumed corporate name shall be effective for a term of five (5) years from the date of filing this application by the Secretary of State of the State of Tennessee and that the corporation may renew such right for an additional five (5) year term by filing a renewal application and paying a renewal fee within two (2) months preceding the expiration date of such right.

Dated:      November _14_, 2001.

                        SETON CORPORATION

                        By: _Kenneth J. Venuto_

                        Kenneth J. Venuto, Secretary

760507 v1
084000-404 11/14/01